702 A.2d 838

IN THE MATTER OF THE ADOPTION OF AMENDMENTS
TO N.J.A.C. 6:28–2.10, 3.6 AND 4.3.

Superior Court of New Jersey
Appellate Division

Argued October 21, 1997—Decided November 13, 1997.

Before Judges CONLEY, WALLACE and CARCHMAN.

*Nancy E. Faccone* argued the cause for appellant New Jersey Protection and Advocacy, Inc. (*Linda D. Headley*, of counsel, *Ms. Faccone*, on the brief).

*Geraldine Callahan*, Deputy Attorney General, argued the cause for respondent State Board of Education (*Peter Verniero*, Attorney General, attorney; *Michael J. Haas*, Senior Deputy Attorney General, of counsel; *Ms. Callahan*, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

This appeal involves a particular provision of the Department of Education's regulations governing handicapped children, specifically *N.J.A.C.* 6:28–3.6(d)(5)(xv). Pursuant to that regulation, the individualized education program each local district must develop for a handicapped child must include in its description of the child's education program "any specialized equipment and materials" necessary. In contrast, the governing federal statutes, the Individuals with Disabilities Education Act (IDEA), 20 *U.S.C.A.* §§ 1400 to –1485, amended by Pub.L. No. 105–17, § 601 to –657, 111 Stat. 37 (1997) (20 *U.S.C.A.* §§ 1400 to –1491(*o*) (1997)) [1], and

---

[1] Effective June 1997, the IDEA was substantially amended. The new IDEA recodifies and reorganizes the prior law. For the most part, the substantive provisions that we cite in this opinion continue in the new law. The new IDEA,

the Technology–Related Assistance for Individuals with Disabilities Act, (Technology Act), 29 *U.S.C.A.* §§ 2201 to –2288, require as part of a child's education program consideration of "assistive technology devices" and "assistive technology services" as defined in the IDEA and Technology Act. Plaintiff, New Jersey Protection and Advocacy, Inc., contends that the terminology the State regulation uses is different from and, facially at least, more narrow than the federal terminology and therefore is invalid. We agree.

*I*

Before we discuss the applicable federal and State law, some background in connection with the present dispute between the parties may be helpful. On April 4, 1994, the Department published proposed amendments to *N.J.A.C.* 6:28–2.10, 3.6 and 4.3, including the amendment to *N.J.A.C.* 6:28–3.6(d)(5)(xv) specifically at issue in this matter. 26 *N.J.R.* 1422, 1423 (April 4, 1994). As proposed, *N.J.A.C.* 6:28–3.6(d)(5)(xv) would require that the individualized education program (IEP) of a child with a disability must include "any specialized equipment or materials" necessary to ensure that the child receives a free appropriate public education (FAPE) as required by IDEA. *See* 20 *U.S.C.A.* § 1400(c), amended by Pub.L. No 107–17, § 601(d)(1)(A), 111 Stat. 42 (1997) (20 *U.S.C.A.* § 1400(d)(1)(a) (1997)); 20 *U.S.C.A.* § 1412(1), (2)(A)(i), amended by Pub.L. No. 105–07, § 612(a)(1), 111 Stat. 60 (1997) (20 *U.S.C.A.* § 1412(a)(1)(1997)). Prior to the amendment, *N.J.A.C.* 6:28–3.6(d)(5)(xv) provided that the child study team need only include any specialized equipment. During the regulatory process on this proposed amendment, the Department was requested to specifically incorporate the federal terms "assistive

however, has not yet been published, although it is available on Westlaw and in its Public Law format as reproduced in the Congressional & Administrative News, No. 5. Because the parties have referred to the old IDEA, for ease of understanding we have used those citations, followed by the corresponding citations in the 1997 law as they appear in the Public Law format. We have also put in parenthesis the new 20 *U.S.C.A.* citations as located on Westlaw.

technology, services and training" into *N.J.A.C.* 6:28–6(d)(5)(xv). By letter dated May 2, 1994, Deborah Bain, chairperson of the Technology Assistive Resource Program (TARP), pointed out that the purpose of the Technology Act was to "expand the availability of assistive technology services and devices to individuals with disabilities." TARP recommended that the Department amend *N.J.A.C.* 6:28–3.6(d)(5)(xv) to specifically include these common federal terms to facilitate greater understanding and effective communication between and among departments and provide consumers with a broader spectrum of equipment and services options.

In addition, on May 4, 1994, the New Jersey Department of the Public Advocate, Division of Advocacy for the Developmentally Disabled (DADD), plaintiff's predecessor agency, also submitted comments to the proposed amendments. DADD expressed concern that the federal terms "assistive technology devices" and "assistive technology services" were not specifically identified as items the local school districts would be required to consider and to provide to qualified students through the IEP planning process. DADD recommended that the Department revise the proposed amendments to include "assistive technology devices" and "assistive technology services" as items required for consideration during the IEP planning process.

In response, the Department determined that the proposed amendment should only modify "specialized equipment" to include "specialized materials" 26 *N.J.R.* 2787 (July 5, 1994). In rejecting the requests to use the federal terminology, the Department stated that it "believes that assistive technology [was] included in specialized equipment and materials. In addition, assistive technology [including environmental adaptations] is referenced at *N.J.A.C.* 6:28–4.2(a)(1)(v) under program options. Therefore, the Department believes that the issue is addressed in regulation." 26 *N.J.R.* 2787–88. And so the Department adopted the proposed amendment without the federal terminology. This appeal ensued.

## II

The IDEA (formerly the Education of All Handicapped Children Act (EAHCA)), provides federal money to assist states and local agencies in educating handicapped children. *Hendrick Hudson Dist. Bd. of Educ. v. Rowley,* 458 *U.S.* 176, 179, 102 *S.Ct.* 3034, 3037, 73 *L.Ed.*2d 690, 695–96 (1982). Receipt of those funds is conditioned on a participating state's compliance with the IDEA's goals and requirements. *Lascari v. Board of Educ., Ramapo Indian Hills Reg'l Sch. Dist.,* 116 *N.J.* 30, 33–34, 560 *A.*2d 1180 (1989); *see also Hendrick Hudson Dist. Bd. of Educ. v. Rowley, supra,* 458 *U.S.* at 180–81, 102 *S.Ct.* at 3037–38, 73 *L.Ed.*2d at 696. New Jersey has elected to participate in the federal program. As such, it has enacted legislation, *N.J.S.A.* 18A:46–1 to –46, and adopted regulations, *N.J.A.C.* 6:28–1.1 to –12.1, that assure all handicapped children the right to a free appropriate public education (FAPE) as required by the IDEA. *N.J.A.C.* 6:28–1.1(b)(1).

The IDEA mandates that a handicapped child's FAPE must be "tailored to the unique needs of [that] handicapped child through an 'individualized education program' (IEP)," and reviewed annually. *Lascari v. Board of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist., supra,* 116 *N.J.* at 34, 560 *A.*2d 1180 (citing 20 *U.S.C.A.* § 1414(a)(5)). Consistent with the federal requirements, the Department's regulations require the local school districts to take the lead and to develop an appropriate IEP for each handicapped child. *N.J.S.A.* 18A:46–8; *N.J.A.C.* 6:28–3.6(a). The Department's regulations detail the educational goals and objectives to be included in the IEP and the action needed to meet them. *N.J.A.C.* 6:28–3.6. And each district must provide educational programs and related services in accordance with the IEPs. *N.J.A.C.* 6:28–4.1.

The Department's regulatory scheme provides for the initial evaluation and classification of a child by a "child-study team," which consists of a school psychologist, a learning disabilities teacher-consultant, and a school social worker. *N.J.A.C.* 6:28–3.1(b); *N.J.A.C.* 6:28–1.3. The child-study team determines wheth-

er a child is eligible for special education; it also develops, monitors, and evaluates the child's IEP. *N.J.A.C.* 6:28–3.1(a). Parents must be involved in the development of the IEP. 20 *U.S.C.A.* § 1412(7)(A), amended by Pub.L. No. 105–17, § 614(d)(1)(A)(viii)(II), 111 Stat. 85 (1997) (20 *U.S.C.A.* § 1414(d)(1)(A)(viii)(II) (1997)); 20 *U.S.C.A.* § 1414(a)(1)(C)(iii), amended by Pub.L. No. 105–17, § 614(a)(1)(C)(i), 111 Stat. 81 (1997) (20 *U.S.C.A.* § 1414(a)(1)(C)(i) (1997)); 20 *U.S.C.A.* § 1414(a)(5), amended by Pub.L. No. 105–17, § 614(c)(3), (4)(A), 111 Stat. 83 (1997); (20 *U.S.C.A.* § 1414(c)(3), (4)(A) (1997)); § 614(d)(1)(B)(i), 111 Stat. 85 (1997); (20 *U.S.C.A.* § 1414(d)(1)(B)(i) (1997)); 34 *C.F.R.* § 300.345; *N.J.A.C.* 6:28–2.3(e); *N.J.A.C.* 6:28–3.6(b), (c).

The federal law also requires participating states to provide certain procedural safeguards for handicapped children and their parents. 20 *U.S.C.A.* § 1415(a)–(e), § 1415(b)(1), amended by Pub.L. No. 105–17, § 615, 111 Stat. 88 (1997) (20 *U.S.C.A.* § 1415 (1997)). The minimum procedures mandated include parental access to relevant school records, notice to parents of any proposed change in a child's educational placement, and the right to present complaints related to the child's placement or provision of free appropriate education. 20 *U.S.C.A.* § 1415(b)(1)(A), (C), (E), amended by Pub.L. No. 105–17, § 615(b)(1), (b)(3), (b)(6), 111 Stat. 88 (1997) (20 *U.S.C.A.* § 1415(b)(1), (b)(3), (b)(6) (1997)). When a dispute arises between the board and the parents, either party has the right to resolve the matter through mediation and, thereafter, an "impartial due process hearing." 20 *U.S.C.A.* § 1415(b)(2), amended by Pub.L. No. 105–17, § 615(b)(5), § 615(e), § 615(f), 111 Stat. 88, 90, 91 (1997) (20 *U.S.C.A.* § 1415(b)(5), 1415(e), 1415(f) (1997)). Under the New Jersey regulations, when parents of a handicapped child are dissatisfied with his or her education, they have the right to request a mediation conference, *N.J.A.C.* 6:28–2.6, or to request a due-process hearing, *N.J.A.C.* 6:28–2.7. A party aggrieved by the due process hearing may bring a civil action in State or federal court. 20 *U.S.C.A.* § 1415(e)(2), amended by Pub.L. No. 105–17, § 615(i)(2)(A), 111 Stat. 92 (1997) (20 *U.S.C.A.*

§ 1415(i)(2)(A) (1997)).[2]  Of course, to fully utilize these procedural safeguards, the parents must know, or be able to readily ascertain, the available special education options.

A handicapped child in New Jersey, then, is entitled to a panoply of rights conferred under the IDEA, its implementing regulations, 34 *C.F.R.* §§ 300.1 to –754 [3], and the corresponding state statutes governing special education, *N.J.S.A.* 18A:46–1 to –46, and regulations, *N.J.A.C.* 6:28–1.1 to 12.1.  Since New Jersey's statutory and regulatory scheme is intended to reflect the federal standard, *Lascari, supra,* 116 *N.J.* at 48, 560 *A.*2d 1180; *N.J.A.C.* 6:28–1.1, it is the IDEA to which we turn our attention.

## III

▮ Originally enacted as the Education for All Handicapped Children Act, the federal law was "in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out.' " *Rowley, supra,* 458 *U.S.* at 179, 102 *S.Ct.* at 3037, 73 *L.Ed.*2d at 695 (quoting H.R.Rep. No. 94–332, p. 2 (1975)). In 1990, Congress amended the IDEA to, among other things, add the definitions of "assistive technology device" and "assistive

---

[2] In order to qualify for federal financial assistance, a state must demonstrate through a detailed plan submitted to the Secretary of Education for approval "that it 'has in effect a policy that assures all handicapped children the right to a free appropriate public education' ... tailored to the unique needs of the handicapped child by means of an individualized educational program." *Rowley, supra,* 458 *U.S.* at 180–81, 102 *S.Ct.* at 3037–38, 73 *L.Ed.*2d at 695–96.  The plan must assure that all federal funds will be spent in a manner consistent with the provision of a FAPE to all handicapped children in the state.  20 *U.S.C.A.* § 1412(a)(2), amended by Pub.L. No. 105–17, § 612(a)(1)(A), 111 Stat. 60 (1997) (20 *U.S.C.A.* § 1412(a)(1)(A) (1997)).  By letter dated September 29, 1994, the Assistant Secretary of the United States Department of Education conditionally approved New Jersey's plan for 1995–1997.

[3] New regulations under the 1997 IDEA have been proposed but not yet adopted. *See* 62 *Fed.Reg.* 55,026 (1997) (to be codified at 34 *C.F.R.* pts. 300, 301 and 303 (proposed Oct. 22, 1997)).

technology service" as they are defined in the Technology Act. 20 *U.S.C.A.* § 1401(a)(25), (26), amended by Pub.L. No. 105–17, § 602(1), (2), 111 Stat. 42 (1997) (20 *U.S.C.A.* § 1401(1), (2) (1997)). A child's IEP, therefore, must include consideration of available assistive technology devices and services. Pub.L. No. 105–117 § 614(d)(3)(B)(v) (20 *U.S.C.A.* § 1414(d)(3)(B)(v) (1997)).[4] This Congressional action was in response to a finding that since the enactment of the original Act, advances in the development and use of assistive technology had provided new opportunities for children with many disabilities to participate in educational programs. H.R.Rep. No. 101–476, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 *U.S.C.C.A.N.* 1723, 1730. However, Congress recognized that

(1) there continue[d] to be a *gap between the need for assistive technology and the level of awareness among special education and related services personnel of the existing devices and services available* for students with disabilities, and

(2) *there continue[d] to be confusion* among the various disciplines regarding the vocabulary of terms used in reference to technology-related programs and services.

[*Ibid.*]

Congress specifically incorporated the terms "assistive technology devices" and "assistive technology services," as defined in the Technology Act, into the IDEA in order:

(1) to clarify the broad range of assistive technology devices and related services that are available, and (2) to increase the awareness of assistive technology as an important component of meeting the special education and related service needs of many students with disabilities, and thus enable them to participate in, and benefit from, educational programs.

[*Id.* at 1731.]

Additionally, the United States Department of Education amended the federal regulations implementing IDEA by adding the Technology Act's definitions of "assistive technology device"

---

4 Prior to the 1997 amendments, the IDEA as amended in 1990 added the definitions of assistive technology devices and services but did not include an express provision that such devices and services were to be considered in a child's IEP. That requirement, however, was made clear by federal regulation. 34 *C.F.R.* § 300.346(a)(3).

and "assistive technology service" at 34 C.F.R. §§ 300.5 and 300.6 respectively. 34 C.F.R. § 300.308, further, specifically directs

> [e]ach public agency *shall* ensure *that assistive technology devices or assistive technology services,* or *both, as those terms are defined* in §§ 300.5—300.6, are *made available to a child with a disability if* required *as a part of the child's [s]pecial education* ..., *[r]elated services* ..., or *[s]upplementary aids and services* ....

[emphasis added].

The IEP for each child must include a statement of the specific special education, related services, or supplementary aids and services to be provided to the child. 34 C.F.R. § 300.346. As we have said, each child's IEP is developed at a meeting between the parents and local school districts. If the IEP team determines that a child with handicaps requires assistive technology in order to receive FAPE, and designates such assistive technology, as either special education, related services, or supplementary aids or services, the child's IEP must include a specific statement of such services, including the nature and amounts of the services. 34 *C.F.R.* § 300.346(a)(3); App. C to 34 *C.F.R.* pt 300 (question 51); *see* Pub.L. No. 105–17, § 614(d)(1)(A)(iii), 111 Stat. 84 (1997) (20 *U.S.C.A.* § 1414(d)(1)(A)(iii) (1997)) and § 614(d)(3)(B)(v), 111 Stat. 86 (1997) (20 *U.S.C.A.* § 1414(d)(3)(B)(v) (1997)). The point is, of course, that all must know what "assistive technology devices and services" are in order to implement the requirement that such services or devices, where required, be included in the child's IEP.

In this respect, and as we have indicated, the terms "assistive technology device" and "assistive technology service," required under the IDEA to be part of a handicapped child's IEP in a participating state, have their origination in the Technology Act. That act defines "assistive technology device" as:

> any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of individuals with disabilities.

[29 *U.S.C.A.* § 2202(2).]

The term "assistive technology service" is defined as:

> any service that directly assists an individual with a disability in the selection, acquisition, or use of an assistive technology device. Such term includes

(A) the evaluation of the needs of an individual with a disability, including a functional evaluation of the individual in the individual's customary environment;

(B) purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices by individuals with disabilities;

(C) selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing of assistive technology devices;

(D) coordinating and using other therapies, interventions, or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs;

(E) training or technical assistance for an individual with disabilities, or, where appropriate, the family members, guardians, advocates, or authorized representatives of such an individual; and

(F) training or technical assistance for professionals (including individuals providing education and rehabilitation services), employers, or other individuals who provide services to, employ, or are otherwise substantially involved in the major life functions of individuals with disabilities.

[29 *U.S.C.A.* § 2202(3)(emphasis added). *See* 20 *U.S.C.A.* § 1401(a)(25), (26), as amended by Pub.L. No. 105–17, § 602(1),(2), 111 Stat. 42 (1997) (20 *U.S.C.A.* § 1401(1), (2) (1997)).]

Facilitating the availability of assistive technology devices and services and encouraging the awareness of such devices and services, including those available as part of a handicapped child's IEP, was a primary goal of the Technology Act. As noted by Congress:

*Many individuals with disabilities and their families remain unaware that assistive technology needs should be considered within the individual program planning requirements of the statutes that authorize development of such individualized plans.* Within each of these four program plan requirements [ (*IEP,* IWRP, IFSP, IHP) ] there are different standards of need, descriptions of scope of services, requirements of financial responsibility, and different appeals processes. All four plans establish an agreement in the nature of a contract between the public agency and the individual with a disability regarding services and equipment to be provided.

[H.R. Rep. No. 103–208, 103rd Cong. 1st Sess. (1993), *reprinted in* 1994 *U.S.C.C.A.N.* 3, 13–14 (emphasis added).]

Accordingly, the Technology Act was designed to be a vehicle for introducing the common language of assistive technology devices and assistive technology services across federally funded programs that provide services to people with disabilities including the IDEA. *See for example,* 42 *U.S.C.A.* § 6001(22); 29 *U.S.C.A.* § 706(23), (24). Thus, Congress intended the Technology Act to:

(E) *increase and promote coordination among State* agencies, and between State agencies and private entities that are involved in carrying out activities under this subchapter ...

(F)(i) *increase the awareness of laws, regulations,* policies, practices, procedures, and organizational structures, *that facilitate the availability or provision of assistive technology devices and assistive technology services;* and

(ii) *facilitate the change of laws, regulations,* policies, practices, procedures and organizational structures, *that impede the availability or provision of assistive technology devices and assistive technology services;*

　　·　　　　·　　　　·　　　　·　　　　·　　　　·　　　　·　　　　·

(I) *increase awareness and knowledge of the efficacy of assistive technology devices and assistive technology services* among—

(i) *individuals with disabilities and their family members,* ...

(iii) *educators* and related service personnel.

[29 *U.S.C.A.* § 2201(b)(1)(emphasis added).]

Importantly, states receiving funds shall provide an assurance to develop, implement, and monitor state laws and regulations "that will improve access to, provision of, funding for, and timely acquisition and delivery of, assistive technology devices and assistive technology services...." 29 *U.S.C.A.* § 2212(e)(7)(B)(i). Likewise, states shall develop and implement "strategies to *overcome barriers regarding access to, provision of, and funding for, such devices and services.* ..." 29 *U.S.C.A.* § 2212(e)(7)(B)(ii) (emphasis added). Notably, state education and special education services are specifically listed in this section. *Ibid.* States shall also coordinate "activities among State agencies, in order to facilitate access to, provision of, and funding for, assistive technology devices and assistive technology services." 29 *U.S.C.A.* § 2212(e)(7)(B)(iii).

## IV

Before discussing whether the Department regulation complies with the federal laws to ensure that a child's IEP takes into consideration "assistive technology devices" and "assistive technology services" and to provide adequate notice of the availability of those devices and services, we express some puzzlement over the Department's position. During the regulatory process, the De-

partment seemed to be in agreement that the federal terms were applicable, but believed its own proposed language was sufficient. In response to the appeal, we sense that the Department now may be asserting some equivocation as to what it must do under the federal laws. If the Department agrees the federal terms and their definition under federal law are applicable, we do not understand why it has generated the present confrontation by not, with the use of whatever language may be deemed appropriate, making it clear to all who read the regulations that the category "specialized equipment and materials" does include "assistive technology devices and services" as defined by the Technology Act and as expressly incorporated into the IDEA, as have other agencies of this State. *See N.J.A.C.* 10:46–2.3(d)(3) (Department of Human Services, Division of Developmental Disabilities, "support services" include "assistive devices"); *N.J.A.C.* 12:45–1.2 (Department of Labor, Division of Vocational Rehabilitation Services, "rehabilitative technology" includes "rehabilitative engineering, assistive technology devices, and assistive technology services"). *And see, Fla. Stat. Ann.* § 228.041(19) (West 1996); *Ind.Code. Ann.* § 20–10.1–25.3–10(17) (West 1997); *La.Rev.Stat. Ann.* § 17:1972(2)(e)(xiii) (West 1997); *Minn.Stat. Ann.* §§ 120.17(3a)(1), 120.187, 120.1701(4)(b) (West 1996); *Miss.Code Ann.* § 37–23–195 (1996); *Mo. Ann. Stat.* § 191.850 (West 1996); *Mont.Code Ann.* §§ 20–7–401(1), (2), 20–7–411(5) (1996); *N.Y.*Public Health Law § 2541(7)(h)(xv) (McKinney 1997); *Or.Rev.Stat.* § 343.223 (1995); *Utah Code Ann.* § 53A–24–110.5 (1997).

But be that as it may, regulations adopted by administrative agencies, of course, are accorded substantial deference, so long as they are consistent with the governing statutes' terms and objectives. *Nelson v. Board of Educ. of Tp. of Old Bridge,* 148 *N.J.* 358, 364, 689 *A.*2d 1342 (1997); *Matter of Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996). A regulation is presumed to be reasonable and valid. *Matter of Repeal of N.J.A.C. 6:28,* 204 *N.J.Super.* 158, 160, 497 *A.*2d 1272 (App.Div.1985). "If procedurally regular, it may be set aside only if it is proved to be arbitrary

or capricious or if it plainly transgresses the statute it purports to effectuate, *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978), or if it alters the terms of the statute or frustrates the policy embodied in it." *Id.* at 160–62, 497 *A.*2d 1272 (citing *New Jersey Chamb. Commerce v. New Jersey Elec. Law Enforce. Comm.,* 82 *N.J.* 57, 82, 411 *A.*2d 168 (1980)). *See D.I.A.L. v. New Jersey Dep't of Comm. Affairs,* 254 *N.J.Super.* 426, 435, 603 *A.*2d 967 (App.Div.1992).

■ An agency must, of course, act consistently with any applicable federal law, and its regulations, when a federal standard governs, must foster the federal policies. *D.I.A.L. v. New Jersey Dep't of Comm. Affairs, supra,* 254 *N.J.Super.* at 435, 603 *A.*2d 967; *Radiological Soc. v. New Jersey State Dep't of Health,* 208 *N.J.Super.* 548, 553–59, 506 *A.*2d 755 (App.Div.), *certif. denied,* 104 *N.J.* 444, 517 *A.*2d 434 (1986); *Eherenstorfer v. Division of Pub. Welfare,* 196 *N.J.Super.* 405, 414–15, 483 *A.*2d 212 (App.Div.1984); *Monmouth Cty. Bd. of Soc. Servs. v. A.B.,* 194 *N.J.Super.* 4, 6, 475 *A.*2d 1266 (App.Div.1984); *Barrera v. Department of Insts. and Agencies,* 150 *N.J.Super.* 41, 45, 374 *A.*2d 1219 (App.Div.1977); *Communications Workers v. Union Cty. Welfare Bd.,* 126 *N.J.Super.* 517, 525, 315 *A.*2d 709 (App.Div.1974). *And see In re Conklin,* 946 *F.*2d 306, 308 (4th Cir.1991) (IDEA "sets a federal minimum to be complied with by the States regarding the provision of educational services to handicapped children . . ."); *Board of Educ. of City of N.Y. v. Ambach,* 612 *F.Supp.* 230, 234 n. 2 (D.C.N.Y.1985); *Daniel R.R. v. State Bd. of Educ.,* 874 *F.*2d 1036, 1048 (5th Cir.1989) ("[t]he Act does not permit states to make mere token gestures to accommodate handicapped students.").

Our decision in *Matter of Repeal of N.J.A.C. 6:28, supra,* 204 *N.J.Super.* at 162, 497 *A.*2d 1272, is illustrative. There we considered a special education regulation adopted by the Department in light of an IDEA requirement that participating states develop plans to provide all handicapped children with appropriate public education "regardless of the severity of their handicap." The Department of Education's regulation had narrowed the scope of

the statute by not requiring the handicap to be a "serious" one. Like the present case, the Department labeled the plaintiff's concern a "quibble over semantics" and assured that a child with a worsening condition would be identified as having a "serious" impairment. *Id.* at 161, 497 *A.*2d 1272. Finding the Department's assurance insufficient, we expressed concern that

the regulation impermissibly narrows the statutory language and frustrates the policy embodied in it. We are concerned that the professionals will follow its plain meaning rather than its unexpressed intention.

[*Id.* at 162, 497 *A.*2d 1272.]

We said that "[s]ince the regulations are written to be read and followed by nonlawyers in hundreds of school districts across the state, a statewide knowing wink at the plain meaning of the language of the regulation is not a reliable solution." *Id.* at 163–64, 497 *A.*2d 1272. Thus, we invalidated the Department's regulation. *Id.*

The amendment here fails to include a definition of "specialized equipment and materials." While the amendment does refer to "assistive technology including environmental adaptations," it is not in the context of an IEP, but rather in the context of "[a] full continuum of alternative placements" and as an educational program option for education in the regular classroom. *N.J.A.C.* 6:28–4.2(a)(1)(v). "Assistive technology devices and services" as defined under the federal law are not so limited. Moreover, the amendment does not provide a more specific definition of what constitutes "assistive technology." *N.J.A.C.* 6:28–1.3 does state that words and terms, unless otherwise defined in the regulations, "shall be defined in the same manner as those words and terms used in the [IDEA]." But since the critical federal terms, "assistive technology *devices* and *services*" are not included in the regulation, this would suggest the federal definitional provisions for them are not applicable at all.

Plaintiff posits that "[e]xamples of assistive technology devices range from a wheelchair accessible desk to enable a child to complete class assignments, to customized cushions to enable a child to be properly and comfortably positioned so he or she can

fully concentrate and participate in class work and discussions, to a communications device that allows a child without speech or hearing to communicate with teachers and other students. Examples of corresponding assistive technology services range from an evaluation of the student who needs the device, to training to use the device for the student, and his or her teachers, aides and parents." These examples would indeed appear to fall within the federal definitions. *See* 29 *U.S.C.A.* § 2202(2), (3); 20 *U.S.C.A.* § 1401(a)(25), (26), as amended by Pub.L. No. 105–17, § 602(1), (2), 111 Stat. 37, 42 (1997) (20 *U.S.C.A.* § 1401(1), (2) (1997)). Facially, the State category of "specialized equipment and materials" is not so broad. While it might encompass the examples of assistive technology *devices*, it would not appear to encompass the examples of assistive technology *services*.

It may well be that, as intended by the Department, both "assistive technology devices" and "assistive technology services" as defined in the federal law, are to be considered by the local districts in developing a child's IEP as "specialized equipment or materials." But it is not the Department that acts upon and utilizes *N.J.A.C.* 6:28–3.6 in the first instance. That responsibility is at the local level. We have no assurance that the Department's intentions are fully understood, or that the full extent of what might be available as an "assistive technology device or service" under the federal law is known. And even if the local district personnel are aware of that, we doubt the regulation as presently written would convey that to a parent.

To make the availability of these devices and services known and accessible, in part, was the purpose of Congress' adoption of the Technology Act as part of the IDEA requirements. Use of the term "specialized equipment and materials," without any definition at all simply does not further that purpose. Indeed, it may hinder it.

■ We briefly address the Department's reliance upon the September 29, 1994 letter from the Assistant Secretary of the United States Department of Education (USDOE) conditionally

approving the Department's education plan for 1995 to 1997. First, plaintiff was not a party to that approval process. Second, the State's reliance upon *Georgia Assoc. of Retarded Citizens v. McDaniel,* 716 *F.*2d 1565, 1572 (11th Cir.1983), *cert. granted and judgment vacated,* 468 *U.S.* 1213, 104 *S.Ct.* 3581, 82 *L.Ed.*2d 880 (1984), *modified on remand and on other grounds,* 740 *F.*2d 902 (1984), as support for its contention that the federal approval is dispositive, is misplaced. There the court recognized there is no statutory provision by which a concerned parent may challenge a state plan once it has been approved by the USDOE. But in striking down a Georgia state provision, approved by the USDOE, which allowed only 180 days of school for each special education student without considering each student's individual needs, the court stated "[w]e do not find that approval of [the] state plan . . . creates any presumption as to the legality of the 180 day policy. . . ." *Id.* at 1573.

Likewise, we find the Department's somewhat extensive discussion of the USDOE regulations and interpretations thereof as not particularly helpful. As we understand the Department's contentions, these regulations and interpretations demonstrate that "the USDOE [does] not view assistive technology devices and services as some new requirement imposed upon the State. Rather, assistive technology devices and services simply are part of the special education, related services and supplementary aids and services that have always been required to be provided to children with disabilities." That may well be so. We do not suggest that if the Department expressly includes the federal terminology in its regulations that should herald new devices or services. The point is, the Department's terminology does not facially seem to include what the Department says it includes. If it is the Department's fear that by including the exact language of "assistive technology devices and services," local school districts will be required to provide more than the federal government requires under those terms, that clearly can not be so. It is of course the federal parameters that form the boundaries of a child's IEP. The Department's regulation must clearly include those boundaries, if only to

ensure that all affected know that is so, and all are on an equal playing field, not subject to the varying knowledge and interpretive abilities of those calling the plays.

We thus invalidate *N.J.A.C.* 6:28–3.6(d)(5)(xv) to the extent that it does not make clear that "assistive technology devices" and "assistive technology services," as defined under federal law, are to be considered in developing a child's IEP. We remand to the Department for promulgation and adoption of an amendment to *N.J.A.C.* 6:28–3.6 consistent with this opinion. We do not mandate any particular form of amendment.[5]

---

[5] For instance, if the Department wishes to keep the term "specialized equipment and materials" but expressly defines that term as including "assistive technology devices and services" under the federal law, that would probably be sufficient.