771 A.2d 603 (2001)
339 N.J. Super. 168
Wende BAER, Patty Bieth, Colleen Dooley, Dianne Vasquez, New Jersey Protection & Advocacy, Inc., Statewide Parent Advocacy Network, Jersey City Special Education Parents Council, and Alliance for the Betterment of Citizens With Disabilities, Appellants,
v.
Leo KLAGHOLZ, Commissioner, Department of Education, and State Board of Education, Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2000.
Decided April 4, 2001.
*609 Elizabeth A. Athos, Hackensack, Ellen M. Boylan and Rebecca K. Spar, Jersey City, argued the cause for appellants (Education Law Center, Cole, Schotz, Meisel, Forman & Leonard, New Jersey Protection & Advocacy, Inc. and Rutgers Special Education Clinic, attorneys; Ms. Athos, Ms. Boylan, Ms. Spar, Linda D. Headley and Mary F. Harnett, of counsel, and with Ruth Deale Lowenkron, Wendy F. Klein and James T. Kim, on the joint brief).
Michelle L. Miller, Deputy Attorney General, argued the cause for respondents (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; John K. Worthington, Arlene Goldfus Lutz and Terri A. Cutrera, Deputy Attorneys General, on the brief in A-7451-97T1; Ms. Lutz, on the brief in A-6273-99T1).
Zazzali, Fagella & Nowak, Newark, attorneys for amicus curiae New Jersey Education Association (Richard A. Friedman and Aileen M. O'Driscoll, on the brief).
Before Judges STERN, COLLESTER and FALL. *604 *605 *606 *607 *608
*610 The opinion of the court was delivered by FALL, J.A.D.
These appeals, consolidated for opinion purposes, challenge numerous special education administrative regulations promulgated by respondents, Leo Klagholz,[1] Commissioner of the New Jersey Department of Education (Commissioner) and adopted by the State Board of Education (Board), pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400 to 1487.
Appellants, Wende Baer, Patty Bieth, Colleen Dooley, and Dianne Vasquez, are parents of children with neurologically-based disabilities who receive special education and related services. Appellants, New Jersey Protection & Advocacy, Inc., Statewide Parent Advocacy Network, Jersey City Special Education Parents Council, and Alliance For The Betterment of Citizens With Disabilities, are organizations representing the interests of children with disabilities, and their parents.

Table of Acronyms
CBVI New Jersey Department of Human Services, Commission for the Blind and Visually Impaired
CI communication impaired
CST child study team
DDD New Jersey Division of Developmental Disabilities
DOE New Jersey Department of Education
DVRS New Jersey Department of Labor, Division of Vocational Rehabilitation Services
ESY extended school year
FAPE free appropriate public education
IDEA Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400 to 1487
IEP individualized education program
LEA local educational agency
LRE least restrictive environment
SEA state educational agency
SLD specific learning disability
USDOE United States Department of Education

I. Procedural History of Challenges

On August 25, 1994, Governor Christine Todd Whitman issued Executive Order No. 22 directing the Department of Education (Department or DOE) to "complete a comprehensive and thorough review of all current administrative regulations" and to refer to the Board "[a]ll regulations which are not necessary or which promote inefficiency or are overly prescriptive." 26 N.J.R. 3783(a) (Sept. 19, 1994). On November 2, 1994, the Governor issued Executive Order No. 27, which required all State agencies to limit regulation of federal and state programs and to justify any decision to adopt an administrative rule for a program established under federal law or state statute that exceeds the requirements of an existing federal standard. 26 N.J.R. 4723(a) (Dec. 5, 1994).
On August 7, 1996, the Commissioner directed a policy memorandum to members of the Board, addressing the need for amendment to the then-existing special education rules, N.J.A.C. 6:28-1.1 to -12.1. The Board considered discussion-level drafts of proposed amendments, with comments and responses, and made them available to the public at the Board meetings *611 of November 5, 1997 and December 3, 1997.
The Board held public hearings on December 17, 1997, January 27, 28, and 29, 1998, and accepted written comments through January 30, 1998. The Board received comments on the proposed special education regulations from over six hundred individuals and organizations. On March 4, 1998, the Commissioner directed a memorandum to members of the Board, summarizing the proposed new regulations and stating, in pertinent part:
This comprehensive review was conducted to improve special education programs by assuring a balance of flexibility and safeguards. An optimal level of regulation assures that the focus of special education is on instruction and the focus of the instruction is in the core curriculum content standards so that students with disabilities are afforded high quality instruction in a challenging curriculum designed to achieve high standards. Students with disabilities will also be included in the accountability system by participating in statewide assessments. Through such participation, the department may review individual progress and program effectiveness as it does for all students. Finally, the review was conducted to comply with the Individuals with Disabilities Act, 20 U.S.C. §§ 1400 et seq., which was reauthorized on June 4, 1997.
....
The basis of the proposed new rules was presented as a policy statement to the State Board of Education on August 7, 1996. The major elements of the policy statement provided for: flexibility in the functioning of the child study team, changes in the evaluation process, elimination of the categorical classification system, a reduction in the number of special class types, establishment of class size limits, inclusion of all students with disabilities in statewide assessment, and incorporation of the separate rules regarding the plan to revise special education. In addition, clarification of existing rules regarding consent, notice, meetings, discipline, approved clinics and agencies, case manager, home instruction, services in nonpublic schools, and elimination of the outcomes-based innovative project were proposed.
....
As noted above, the Individuals with Disabilities Act was recently reauthorized. There were many changes to the Act and, as a result, the regulations were further modified to reflect these new provisions. The federal requirements for discipline have been incorporated by reference. The United States Department of Education (USDOE) has indicated that they will adopt regulations in the spring of 1998 to implement the act. It is highly likely that this will again require some revisions to these rules.
The Board then revised some areas of the pre-proposal and published the proposed regulations on April 6, 1998 for additional comment. 30 N.J.R. 1219(b) (Apr. 6, 1998). The Board held a public hearing on April 15, 1998. The Commissioner sent a memorandum to the Board dated June 3, 1998, summarizing and analyzing the proposed regulations. The Board adopted the proposed regulations at its June 3, 1998 meeting, and the regulations became effective on July 6, 1998.
The challenged regulations, codified at N.J.A.C. 6A:14-1.1 to -10.1, superseded and replaced the earlier special education regulations, N.J.A.C. 6:28-1.1 to -12.1. On August 20, 1998, appellants filed a notice of appeal, challenging several provisions contained in the promulgated regulations, and raising fifty-five separate issues in their *612 case information statement. This appeal was docketed as A-7451-97T1.
On August 3, 1998, the Board published proposed amendments to certain sections of the new code. 30 N.J.R. 2852(a) (Aug. 3, 1998). On October 7, 1998, the Board adopted the amendments and they became effective on November 2, 1998. 30 N.J.R. 3491(a) (Nov. 2, 1998). On December 16, 1998, appellants filed an amended notice of appeal, to include these rule amendments in their challenge.
On March 12, 1999, the USDOE adopted new regulations, codified at 34 C.F.R. Part 300, which became effective on May 11, 1999. 64 Fed.Reg. 12406 (Mar. 12, 1999). As a result of these revised federal regulations, the Commissioner sought to revise New Jersey's special education regulations to assure conformity, and proposed amendments for the Board to consider. On March 6, 2000, the Board issued proposed amendments to the regulations. 32 N.J.R. 755(a) (Mar. 6, 2000). On May 5, 2000, these amendments were adopted, effective June 5, 2000. 32 N.J.R. 2052(a) (June 5, 2000). Included in the publication of the adoption was a summary of comments from twelve different sources and responses thereto by the Board.
On July 14, 2000, appellants filed a motion with this court, seeking leave to file an amended notice of appeal to encompass challenges to the June 5, 2000 rule amendments adopted by the Board. On July 27, 2000, we entered an order directing that the proposed amended notice of appeal be treated and docketed as a new appeal, and be calendared back-to-back with A-7451-97T1. In accordance with that order, the amended notice of appeal was docketed as A-6273-99T1.
Since adoption of the June 5, 2000 amendments to the regulations resolved a number of issues raised in the original appeal, A-7451-97T1, appellants, at our request, by letter dated December 15, 2000, outlined those claims that have now been resolved by the new amendments, or withdrawn, and those regulations they continue to challenge. Our opinion will focus only on those regulations still challenged by appellants.

II. The Federal Requirements

"Although education is primarily a concern of state and local governments, the education of handicapped children is regulated by a complex scheme of federal and state statutes and administrative regulations." Lascari v. Board of Educ., 116 N.J. 30, 33, 560 A.2d 1180 (1989). In In re Adoption of Amendments to N.J.A.C. 6:28-2.10, 305 N.J.Super. 389, 702 A.2d 838 (App.Div.1997), we summarized the federal initiative and its relationship to this State, as follows:
The IDEA (formerly the Education of All Handicapped Children Act (EAHCA)), provides federal money to assist states and local agencies in educating handicapped children. Receipt of those funds is conditioned on a participating state's compliance with the IDEA's goals and requirements. New Jersey has elected to participate in the federal program. As such, it has enacted legislation, N.J.S.A. 18A:46-1 to -46, and adopted regulations, N.J.A.C. [now 6A:14-1.1 to -10.2], that assure all handicapped children the right to a free appropriate public education (FAPE) as required by the IDEA.
[Id. at 394, 702 A.2d 838 (other citations omitted).]
Accordingly, "the education of handicapped children is an exercise in cooperative federalism." Lascari, supra, 116 N.J. at 33, 560 A.2d 1180. In enacting the IDEA, Congress concluded, inter alia, *613 that the education of children with disabilities can be made more effective by,
(A) having high expectations for such children and ensuring their access in the general curriculum to the maximum extent possible;
(B) strengthening the role of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children in school and at home;
(C) coordinating this chapter with other local, educational service agency, State and Federal school improvement efforts in order to ensure that such children benefit from such efforts and that special education can become a service for such children rather than a place where they are sent; [and]
(D) providing appropriate special education and related services and aids and supports in the regular classroom to such children, whenever appropriate[.]
[20 U.S.C.A. § 1400(c)(5)(A)-(D).]
Congress also determined that,
While States, local educational agencies, and educational service agencies are responsible for providing an education for all children with disabilities, it is in the national interest that the Federal Government have a role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law.
[20 U.S.C.A. § 1400(c)(6).]
Congress also recognized its obligation to "be responsive to the growing needs of an increasingly more diverse society[,]" and the need for "[a] more equitable allocation of resources ... to meet its responsibility to provide an equal educational opportunity for all individuals." 20 U.S.C.A. § 1400(c)(7)(A). Congress found that "[t]aken together as a group, minority children are comprising an ever larger percentage of public school students[,]" 20 U.S.C.A. § 1400(c)(7)(D), and that "[t]he limited English proficient population is the fastest growing in our Nation[.]" 20 U.S.C.A. § 1400(c)(7)(F). Congress concluded that "[g]reater efforts are needed to prevent the intensification of problems connected with mislabeling and high dropout rates among minority children with disabilities." 20 U.S.C.A. § 1400(c)(8)(A).
Based on these findings, Congress delineated the purposes of IDEA, as follows:
(1) (A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living;
(B) to ensure that the rights of children with disabilities and parents of such children are protected; and
(2) to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families;
(3) to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting systemic-change activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services; and *614 (4) to assess, and ensure the effectiveness of, efforts to educate children with disabilities.
[20 U.S.C.A. § 1400(d)(1)-(4).]
Congress has appropriated, and IDEA makes available, significant funding to states and local agencies in educating children with disabilities. Funding eligibility, however, is conditioned upon a state's compliance with the extensive goals and procedures established in the IDEA. 20 U.S.C.A. § 1412. A state is eligible for assistance under the IDEA if the state demonstrates that it "has in effect policies and procedures to ensure that it meets" the requirements of the IDEA, 20 U.S.C.A. § 1412(a), to, inter alia, ensure that a free appropriate public education (FAPE) is available to all children with disabilities, 20 U.S.C.A. § 1412(a)(1)(A); provide a full educational opportunity to all children with disabilities and a timetable for accomplishing that goal, 20 U.S.C.A. § 1412(a)(2); ensure the identification, location, and evaluation of children in need of special education and related services, 20 U.S.C.A. § 1412(a)(3)(A); ensure the development, review, and revision of an individualized education plan (IEP) for children with disabilities, 20 U.S.C.A. § 1412(a)(4); to the maximum extent, provide for the education of children with disabilities in the least restrictive environment (LEA), 20 U.S.C.A. § 1412(a)(5)(A); establish procedural safeguards for children with disabilities and their parents, 20 U.S.C.A. § 1412(a)(6); provide for the proper evaluation of children with disabilities, 20 U.S.C.A. § 1412(a)(7); and require the state educational agency (SEA) to examine data to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities, 20 U.S.C.A. § 1412(a)(22).
The IDEA requires state or local educational agencies to conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability, 20 U.S.C.A. § 1414(a)(1)(A), as well as periodic reevaluations. 20 U.S.C.A. §§ 1414(a)(2); 1414(b); 1414(c).
The LEA is required to provide notice to the parents of a child with a disability, "describ[ing] any evaluation procedures such agency proposes to conduct." 20 U.S.C.A. § 1414(b)(1). In conducting the evaluation, the LEA must use a variety of assessment tools and strategies, must refrain from using any single procedure as the sole criterion for the evaluation, and use technically sound instruments to assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors. 20 U.S.C.A. § 1414(b)(2). Additionally, each LEA is required to apply certain criteria for the selection, use, and administering of tests used in the evaluative process, 20 U.S.C.A. § 1414(b)(3), and in the review of the evaluation data. 20 U.S.C.A. § 1414(c).
At the core of fulfilling the stated intent and purposes of the IDEA is the development, review, revision and implementation of an IEP that each SEA or LEA shall have in effect, at the beginning of each school year, for each child with a disability in its jurisdiction. 20 U.S.C.A. § 1414(d)(2)(A). The IEP must be developed by an individualized education program team (IEP team) composed of the parents of the child with a disability; at least one regular education teacher of the child, if the child is, or participates in, the regular education environment; at least one special education teacher of the child; where appropriate, at least one special education provider of the child; a qualified representative of the LEA; an individual who can interpret the instructional implications of evaluation results; at the discretion of the parent or agency, others who *615 have knowledge or special expertise regarding the child; and, whenever appropriate, the child with a disability. 20 U.S.C.A. § 1414(d)(1)(B). The required components of the IEP are outlined in 20 U.S.C.A. § 1414(d)(1)(A).
The IDEA "also requires participating states to provide certain procedural safeguards for handicapped children and their parents." In re Adoption of Amendments to N.J.A.C. 6:28-2.10, supra, 305 N.J.Super. at 395, 702 A.2d 838. The IDEA provides that:
Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies.

[20 U.S.C.A. § 1415(a).]
The procedures required to be established shall include, in pertinent part:
(1) an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;
....
(3) written prior notice to the parents of the child whenever such agency
(A) proposes to initiate or change; or
(B) refuses to initiate or change,
the identification, evaluation, or educational placement of the child, in accordance with subsection (c) of this section, or the provision of a free appropriate public education to the child;
(4) procedures designed to ensure that the notice required by paragraph (3) is in the native language of the parents, unless it clearly is not feasible to do so; [and]
....
(6) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child[.]

[20 U.S.C.A. § 1415(b).]
The written prior notice to parents required by 20 U.S.C.A. § 1415(b)(3) "shall include a full explanation of the procedural safeguards, written in the native language of the parents, unless it clearly is not feasible to do so, and written in an easily understandable manner[.]" 20 U.S.C.A. § 1415(d)(2).
As authorized by the IDEA, the USDOE adopted comprehensive regulations, 34 C.F.R. § 300.1 to 300.756, implementing the IDEA, designed
(a) To ensure that all children with disabilities have available to them a free appropriate education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living;
(b) To ensure that the rights of children with disabilities and their parents are protected;
(c) To assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities; and
(d) To assess and ensure the effectiveness of efforts to educate children with disabilities.

[34 C.F.R. § 300.1.]

*616 III. The New Jersey Response

New Jersey's election to participate in the federal program to help finance the education of children with disabilities "is reflected in state statutes, N.J.S.A. 18A:46-1 to -46, and regulations, N.J.A.C. [now 6A:14-1.1 to -10.2]." Lascari, supra, 116 N.J. at 34, 560 A.2d 1180. The New Jersey response to the requirements of the IDEA is primarily regulatory, designed to:
1. Ensure that all students with disabilities as defined in this chapter, including students with disabilities who have been suspended or expelled from school, have available to them a free, appropriate public education as that standard is set under the Individuals with Disabilities Act (IDEA) (20 U.S.C. §§ 1400 et seq.)[;]
....
2. Ensure that students with disabilities are educated in the least restrictive environment;
3. Ensure the provision of special education and related services;
4. Ensure that the rights of students with disabilities and their parents are protected;
5. Assist public and private agencies providing educational services to students with disabilities; and
6. Ensure the evaluation of the effectiveness of the education of students with disabilities.

[N.J.A.C. 6A:14-1.1(b).]

IV. Summary of the Challenges

All parties agree that the purposes and goals mandated in these federal and state enactments must be implemented and reflected in the New Jersey special education regulations. The issues in these appeals focus on whether the New Jersey regulatory response meets the IDEA mandatory standards in the process for determination of the eligibility of children with disabilities for services; the methods of evaluation of such children; the development of the IEP; the opportunities for parental participation; the availability of critical documents in the child's native language; the effect of student discipline on the delivery of services; the sufficiency of procedural safeguards; the adequacy of program effectiveness evaluation; and several other areas.

V. Standard of Review

An administrative regulation is accorded a presumption of validity, and the party challenging it bears the burden of establishing that the regulation is arbitrary, capricious, or unreasonable. New Jersey State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999). Moreover,
[i]f procedurally regular, it may be set aside only if it is proved to be arbitrary or capricious or if it plainly transgresses the statute it purports to effectuate, New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978), or if it alters the terms of the statute or frustrates the policy embodied in it. N.J. Chamb. Commerce v. N.J. Elec. Law Enforce. Comm., 82 N.J. 57, 82, 411 A.2d 168 (1980).
[In re Repeal of N.J.A.C. 6:28, 204 N.J.Super. 158, 160-61, 497 A.2d 1272 (App.Div.1985).]
See also In re Freshwater Wetlands Prot. Act Rules, 238 N.J.Super. 516, 526, 570 A.2d 435 (App.Div.1989) ("[T]he legislative grant of authority `is to be liberally construed to enable the agency to accomplish its statutory responsibilities.'") (quoting New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978)); Medical Soc. of N.J. v. New Jersey Dep't of Law & Pub. Safety, 229 N.J.Super. 128, 134, 550 A.2d 1272 (App. *617 Div.1988) (Regulations issued by an administrative agency are "cloaked with a presumption of legitimacy and should be sustained unless clearly ultra vires."), rev'd on other grounds, 120 N.J. 18, 575 A.2d 1348 (1990).
However, "[a]n agency must, of course, act consistently with any applicable federal law, and its regulations, when a federal standard governs, must foster the federal policies." In re Adoption of Amendments to N.J.A.C. 6:28-2.10, supra, 305 N.J.Super. at 402, 702 A.2d 838; see also In re Repeal of N.J.A.C. 6:28, supra, 204 N.J.Super. at 163-64, 497 A.2d 1272 (State regulations concerning education of handicapped must conform to federal funding legislation establishing standards for education of handicapped students); Eherenstorfer v. Division of Pub. Welfare, 196 N.J.Super. 405, 414-15, 483 A.2d 212 (App. Div.1984) (The State must conform its Aid to Families with Dependent Children (AFDC) program to federal statutes and regulations); Monmouth County Bd. of Soc. Servs. v. A.B., 194 N.J.Super. 4, 6, 475 A.2d 1266 (App.Div.1984) ("A state that participates in an AFDC program must comply with federal statutes and federal regulations. A state regulation that conflicts with a federal standard is invalid under the supremacy clause."); Barrera v. Department of Insts. & Agencies, 150 N.J.Super. 41, 45, 374 A.2d 1219 (App.Div. 1977) (State participation in federally supported categorical assistance programs is voluntary, but a state choosing to participate must comply with the terms of the federal legislation and regulations promulgated thereunder); Communications Workers of Am., AFL-CIO v. Union County Welfare Bd., 126 N.J.Super. 517, 525, 315 A.2d 709 (App.Div.1974) (Regulation promulgated by the Department of Health, Education and Welfare pursuant to federal statute and that agency's interpretation of its own regulation constitute a mandate, which the state agency may not ignore).
In this opinion, we have affirmed the adoption of a majority of those special education regulations challenged by appellants. We have also declared several challenged regulations invalid, as violative of the IDEA, the federal special education regulations, or the New Jersey special education laws, and remanded the matter to the Commissioner and Board for the timely promulgation and adoption of curative regulations.
Although not raised by the parties, we are compelled to make certain observations and comments that are apparent to us. One of the stated purposes and intended results of the sweeping changes made to the Department's special education regulations was to provide more flexibility and discretion to local school districts in the determination of eligibility and evaluation of children with disabilities, and in the provision of special education and related services to those children. Additionally, in general, the standards established in New Jersey's current special education regulations are intended to meet, but not exceed, the federal special education standards, as promulgated by the IDEA and its federal regulations. In contrast, the pre 1998 version of New Jersey's special education regulations exceeded the required federal standards in several respects.
Although, within the scope of the current challenges posed by appellants and on this record, these approaches by the Commissioner and Board are generally permissible, we are concerned with the potential adverse consequences of the application of these reduced regulatory standards, and of the effect that the greater flexibility and wider discretion vested in local school districts, will have on the eligibility and evaluation *618 determinations concerning children with disabilities in the poorer, "special-needs" school districts in our State, and the provision of special education and related services to those children.
Since 1970, our State has been entangled in a generational struggle in an "extraordinary effort to bring a thorough and efficient education to children in its poorest school districts." Abbott by Abbott v. Burke, 153 N.J. 480, 490, 710 A.2d 450 (1998) (Abbott V); see Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973); Robinson v. Cahill, 63 N.J. 196, 306 A.2d 65, cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L. Ed.2d 219 (1973); Robinson v. Cahill, 69 N.J. 133, 351 A.2d 713, cert. denied, 423 U.S. 913, 96 S.Ct. 217, 46 L. Ed.2d 141 (1975); Robinson v. Cahill, 69 N.J. 449, 355 A.2d 129 (1976); Robinson v. Cahill, 70 N.J. 155, 358 A.2d 457 (1976); Robinson v. Cahill, 70 N.J. 464, 360 A.2d 400 (1976); Abbott v. Burke, 100 N.J. 269, 495 A.2d 376 (1985) (Abbott I); Abbott v. Burke, 119 N.J. 287, 575 A.2d 359 (1990) (Abbott II) (identifying twenty-eight "special needs" school districts to which judicial remedies were applied); Abbott v. Burke, 136 N.J. 444, 643 A.2d 575 (1994) (Abbott III); Abbott v. Burke, 149 N.J. 145, 693 A.2d 417 (1997) (Abbott IV) (raising the total of the special needs school districts to thirty).
Although the Court concluded that its 1998 decision in Abbott V, supra, "should be the last major judicial involvement" in the effort to provide children in poorer school districts with a thorough and efficient education, 153 N.J. at 490, 710 A.2d 450, judicial intervention was, again, recently required to review implementation of court-mandated programs in the special need school districts. Abbott ex rel. Abbott v. Burke, 163 N.J. 95, 748 A.2d 82 (2000); see also Abbott ex rel. Abbott v. Burke, 164 N.J. 84, 88, 751 A.2d 1032 (2000) (requiring the State to fund all of the costs of necessary facilities remediation and construction in the special needs school districts).
Although the effect of these revised special education regulations on children with disabilities in the special needs districts is not yet documented, it is our hope that the Commissioner and Board will not permit the reduced standards promulgated, and the delegation of more flexibility and discretion in local school districts, to create additional disparities between the quality of education received by children with disabilities in the special needs districts, as compared with that received by children with disabilities in the remainder of our State. We express this concern because of the past documented inability of the public schools in the special needs districts to provide equal opportunities for a thorough and efficient education to their students. In our view, this concern is heightened when attention is focused on our most vulnerable student populationchildren with disabilities.
[For publication purposes, we have abridged the opinion in a manner that discusses only those regulations we have invalidated. Additionally, due to the elimination of a significant portion of the opinion by this abridgement, we have renumbered the topic headings contained herein.
As noted, we have concluded that with respect to the majority of their challenges appellants have failed to sustain their burden of demonstrating that New Jersey's special education regulations, as adopted, are arbitrary, capricious or unreasonable, or are violative of the IDEA, the federal regulations, or New Jersey special education laws. Accordingly, in the area of "Eligibility Criteria," we have rejected appellants' challenges to N.J.A.C. 6A:14-3.5(c)(11)(iii) (use of statistical formulas as a tool in assessing the extent of a discrepancy between academic achievement *619 and intellectual ability in evaluating whether a child has a specific learning disability (SLD)); N.J.A.C. 6A:14-3.5(c)(4) (definition of "communication impaired"); N.J.A.C. 6A:14-1.3 (definition of "student with a disability"); N.J.A.C. 6A:14-3.9(a)(3) (eligibility for "speech-language services"); N.J.A.C. 6A:14-3.5(c)(12) (definition of "neurologically impaired"); and N.J.A.C. 6A:14-3.5(c)(8) (definition of "other health impairment").
In the area of "Evaluation Procedures," we have rejected appellants' challenges to N.J.A.C. 6A:14-2.4(b)(6) and 6A:14-3.4(d)(1) (number of child study team members performing evaluations); N.J.A.C. 6A:14-3.4(h), 6A:14-3.5(c)(5) and 6A:14-3.5(c)(12) (medical evaluations during initial evaluation); N.J.A.C. 6A:14-2.5 and 6A:14-3.4 (individualized basis of initial evaluation); N.J.A.C. 6A:14-3.4 and 6A:14-3.5(c)(4) (uniform standards for content of evaluations).
In the area of "Individualized Education Program (IEP) Requirements," we have rejected appellants' challenges to N.J.A.C. 6A:14-4.2(a)(8)(i) (reasonable accommodations to place children with disabilities in regular classroom); N.J.A.C. 6A:14-4.3(b) (basis for extended school year (ESY) services); N.J.A.C. 6A:14-3.4(c) and 6A:14-3.7(a) (time frames for implementation of the IEP); and N.J.A.C. 6A:14-4.2 and 6A:14-1.3 (definitions of "least restrictive environment" (LRE), "special education," "related services," "free appropriate public education" (FAPE); and "supplementary aids and services").
Under the heading "Challenges to Parental Participation Provisions," we have rejected appellants' challenges to N.J.A.C. 6A:14-1.3 (definition of "native language"); N.J.A.C. 6A:14-2.4 and 6A:14-3.7(j) (provision of documents to parents in their native language); N.J.A.C. 6A:14-1.2 (notice and opportunity to participate in development of special education policy and procedure); N.J.A.C. 6A:14-2.3(i)(6) (parental participation in meetings); and N.J.A.C. 6A:14-1.3 (definition of "parent").
In the area of "Procedural Rights," we have rejected appellants' challenges to N.J.A.C. 6A:14-2.7(m) (emergency relief in discipline cases); and N.J.A.C. 6A:14-2.7(a) (due process hearing rights of adult students).
Under the heading "Children in Receiving Schools," we have rejected appellants' challenges to N.J.A.C. 6A:14-7 (education in the LRE); N.J.A.C. 6A:14-2.3(h) and 6A:14-7 (full access of parents to meetings); and N.J.A.C. 6A:14-7 (programs in receiving schools).
In the area of "Program Administration," we have rejected appellants' challenges to N.J.A.C. 6A:14-1.1(b)(6) (evaluation of program effectiveness); and N.J.A.C. 6A:14-1.2(b)(13) (comprehensive system of professional development).
With respect to "Private Schools," we have rejected appellants' challenges to N.J.A.C. 6A:14-6.1(a)(1) (consultation with representatives of private schools); and N.J.A.C. 6A:14-6.1(b) (expenditures for private school children with disabilities).
We now turn to an analysis of the those challenges we conclude have merit.
VI. Provision of Evaluation Reports to Parents on a Timely Basis
Appellants argue:
BY FAILING TO MANDATE THAT EVALUATION REPORTS BE PROVIDED TO PARENTS IMMEDIATELY UPON THEIR COMPLETION, DOE'S REGULATIONS VIOLATE IDEA.
The IDEA provides, in pertinent part:
(b) Evaluation procedures
....

*620 (4) Determination of eligibility

Upon completion of administration of tests and other evaluation materials
....
(B) a copy of the evaluation report and the documentation of determination of eligibility will be given to the parent.

[20 U.S.C.A. § 1414(b)(4)(B) (emphasis added).]
Similarly, the federal special education regulations require that "[u]pon completing the administration of tests and other evaluation materials... (2) The public agency must provide a copy of the evaluation report and the documentation of determination of eligibility to the parent." 34 C.F.R. § 300.534(a).
The Department's special education regulations provide, in relevant part:
(a) When an initial evaluation is completed for a student age three through 21, a meeting according to N.J.A.C. 6A:14-2.3(i)1 shall be convened to determine whether the student is eligible for special education and related services. A copy of the evaluation report(s) and documentation of eligibility shall be given to the parent. If eligible, the student shall be assigned the classification "eligible for special education and related services." Eligibility shall be determined collaboratively by the participants described in N.J.A.C. 6A:14-2.3(i)1.
[N.J.A.C. 6A:14-3.5(a) (emphasis added).]
This argument was addressed in a published comment and response to the Department's proposed regulations on July 6, 1998, as follows:
80. COMMENT: The proposed rules should be amended to provide parents with copies of the evaluation report(s) prior to the eligibility conference to assure meaningful participation. In addition, the proposed rules should be amended to provide parents with the right to access student records before the eligibility conference.
RESPONSE: The Department disagrees. No additional rule is needed. These rights already exist in the pupil record rules at N.J.A.C. 6:3-6.2(g)1. The parent can obtain a copy of the evaluation report(s) prior to the eligibility conference upon request. The evaluation report(s) is a student record and the Parental Rights in Special Education document makes it clear that the parent has the right to access any student record without delay, before any IEP meeting or hearing, and within 10 days after asking to see the records.
[30 N.J.R. 2435(a), 2442 (July 6, 1998).]
We interpret N.J.A.C. 6A:14-3.5(a) as requiring copies of the evaluation tests and materials be given to the parents at, not prior to, the eligibility conference. This is clearly contrary to the requirement in the IDEA and its regulations that copies of the evaluation tests and materials be furnished to parents upon their completion.
Respondents cite to the following comment issued by the USDOE in support of their position:
The specific content of an evaluation report is appropriately left by the [IDEA] to State and local discretion. Both the [IDEA] and the regulations require that, upon completing the administration of tests and other evaluation materials, a public agency must provide a copy of the evaluation report and the documentation of determination of eligibility to the parent, but neither establishes a timeline for providing these documents to the parents; rather, this timeline is appropriately left to the State and local discretion. It is, however, important to ensure that parents and other *621 IEP team participants have all the information they need to participate meaningfully in IEP meetings. Indeed, § 300.562(a) requires that a public agency comply with a parent request to inspect and review existing educational records, including an evaluation report, without unnecessary delay and before any meeting regarding an IEP.
[64 Fed.Reg. 12406, 12636 (Mar. 12, 1999) (Emphasis added).]
This reliance is misplaced. Although this comment states the USDOE was not establishing a time line for providing evaluation reports to parents, this response clearly states that the IDEA and federal regulations require the evaluation reports and documentation of the determination of eligibility be furnished to parents upon their completion to allow the parents "to participate meaningfully in the IEP meetings." Ibid. We find adherence to this requirement particularly compelling in light of the fact that the evaluation reports and materials will not be provided to parents in their native language. By providing these reports and materials to parents in advance of the eligibility meeting, parents will be given the opportunity of time to, if desired, seek their own interpretation or translation of the documents, coupled with the notice in their native language, to allow for their meaningful participation in the eligibility meeting.
Accordingly, the Board must adopt amendments to N.J.A.C. 6A:14-3.5(a), requiring local school districts to provide a copy of the evaluation report(s) and documentation of eligibility to the parents prior to the eligibility meeting. We read the IDEA and federal regulations as leaving to the discretion of the Board the time line concerning this requirement, as long as the time line adopted results in the report and materials being provided to the parent a reasonable period in advance of the eligibility meeting.

VII. Challenges to Transition Services Criteria

A. Outcome-Oriented Transition Services

Appellants argue:
BY ELIMINATING THE REQUIREMENT THAT EVALUATIONS INCLUDE ASSESSMENTS TO DETERMINE APPROPRIATE POST SECONDARY OUTCOMES FOR STUDENTS WITH DISABILITIES, DOE'S REGULATIONS VIOLATE THE RIGHT OF STUDENTS TO RECEIVE "OUTCOME ORIENTED" TRANSITION SERVICES BASED ON APPROPRIATE ASSESSMENTS, AS REQUIRED BY IDEA, ARE ARBITRARY AND CAPRICIOUS AND VIOLATE STATE SPECIAL EDUCATION LAW.
Appellants rely on the Department's former regulation, which provided:
For pupils with educational disabilities age 14 and over, or younger, if determined appropriate, planning for transition to adulthood shall include the following:
....
2. Initial evaluation or reevaluation shall include assessment(s) to determine appropriate post-secondary outcomes[.]
[N.J.A.C. 6:28-4.7(b).]
The Department's current special education regulations contain no similar requirement for the assessment of appropriate post-secondary outcomes.
The relevant provisions in the IDEA that have a bearing on appellants' argument, are:
(d) Individualized education programs
(1) Definitions

*622 As used in this chapter:
(A) Individualized education program
The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes
....
(vii)(I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program);
(II) beginning at age 16 (or younger, if determined appropriate by the IEP Team), a statement of needed transition services for the child, including, when appropriate, a statement of the interagency responsibilities or any needed linkages[.]
[20 U.S.C.A. § 1414(d)(1)(A)(vii)(I) and (II),]
and:
Except as otherwise provided, as used in this chapter:
....
(30) Transition services
The term "transition services" means a coordinated set of activities for a student with a disability that
(A) is designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
(B) is based upon the individual student's needs, taking into account the student's preferences and interests; and
(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

[20 U.S.C.A. § 1401(30).]
Appellants argue, based upon these provisions of the IDEA, that the federal requirements for outcome-oriented transition services and for assessment-based IEPs together dictate that the evaluation of students, age 14 or over, must include assessments to determine appropriate post-secondary outcomes.
Respondents contend former N.J.A.C. 6:28-4.7(b)(2) was removed because it was redundant. Respondents cite to 20 U.S.C.A. § 1414(b)(2)(A), under which LEAs must "use a variety of assessment tools and strategies to gather relevant functional and developmental information" for the child's IEP, and 20 U.S.C.A. § 1414(b)(3)(D), under which each LEA is required to ensure that there are "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child[.]" Both of these provisions are included in Appendix A of the Department's regulations. The corresponding regulation of the Department addressing protection in evaluation procedures states that in conducting evaluations, district boards of education must "[u]se a variety of assessment tools and strategies to gather relevant functional and developmental information[.]" N.J.A.C. 6A:14-2.5(a)(1). Respondents interpret these provisions as addressing post-secondary outcomes and *623 claim that special education students have the same rights previously afforded to them for post-secondary outcomes as the prior regulations, even though the language was removed. We disagree.
The Department's special education regulations define "transition services," as follows:
"Transition services" means a coordinated set of activities for a student designed with an outcome-oriented process, that promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. Transition services for students with disabilities may be special education, if provided as specially designed instruction, or related services, if required to assist a student with a disability to benefit from special education.

[N.J.A.C. 6A:14-1.3.]
However, there is no provision in the Department's regulations requiring that assessments determine appropriate post-secondary outcomes. Pursuant to N.J.A.C. 6A:14-3.7(d)(8), an IEP shall include "[a] statement of student's transition from an elementary program to the secondary program which shall be determined by factors including number of years in school; social, academic and vocational development; and chronological age[.]" However, this provision fails to include post-secondary outcomes.
Accordingly, the Department's regulations violate the IDEA by failing to include the federal requirement that students receive assessments to determine appropriate post-secondary outcomes and a statement of needed services. The Board shall promulgate and adopt a new or revised regulation providing for same.

VIII. Students With Visual Impairments and Those With the Most Severe Disabilities

Appellants argue:
DOE'S TRANSITION REGULATIONS ARE OVERLY RESTRICTIVE AND DISCRIMINATE AGAINST STUDENTS WHO HAVE VISUAL IMPAIRMENTS AND STUDENTS WITH THE MOST SEVERE DISABILITIES IN VIOLATION OF THE IDEA.
Appellants assert that the Department's transition regulations fail to require consultation with agencies primarily responsible for persons with blindness and developmental difficulties, thereby failing to ensure that a FAPE will be provided to all students entitled to transition services, as mandated by 20 U.S.C.A. § 1412(a)(1)(A).
Appellants rely on N.J.A.C. 6A:14-3.7(c)(9), which provides that when developing the IEP, the IEP team shall "[b]eginning at age 14, or younger if determined appropriate by the IEP team, consider the need for technical consultation from the Division of Vocational Rehabilitation Services, Department of Labor [DVRS] and other agencies providing transition services." Additionally, N.J.A.C. 6A:14-3.7(d)(9) provides that with the exception of an IEP for a student classified as eligible for speech-language services, the IEP shall include
[b]eginning at age 14, or younger if determined appropriate by the IEP team, and updated annually, a statement of the transition service needs of the student under the applicable parts of the student's IEP that focuses on the student's courses of study including, when appropriate, technical consultation from the Division of Vocational Rehabilitation *624 Services, Department of Labor and other agencies providing transition services[.]
Although these provisions address the DVRS, appellants argue that agency does not serve the blind or people with developmental disabilities that are so severe as to preclude the possibility of employment. Appellants contend these regulations should include reference to the Division of Developmental Disabilities (DDD) and a variety of agencies with DDD contracts, as well as the Department of Human Services, Commission for the Blind and Visually Impaired (CBVI).
Appellants also note the Department's regulations only provide for the placement of secondary students in community rehabilitation programs approved by the DVRS, and do not instruct school districts to involve DDD and CBVI. N.J.A.C. 6A:14-4.7(f)(1) provides, in relevant part, as follows:
(f) Secondary level students may be placed in community rehabilitation programs for vocational rehabilitation services according to the following:
1. Community rehabilitation programs shall be approved according to N.J.A.C. 12:51-11 by the New Jersey Department of Labor, Division of Vocational Rehabilitation Services to provide vocational evaluation, work adjustment training, job coaching, skill training, supported employment and time-limited job coaching[.]
Some of these issues were raised when the latest amendments to the Department's regulations were being considered, as follows:
12. COMMENT: The proposed amendment to N.J.A.C. 6A:14-3.7(d)9 regarding transition planning requires consideration of technical consultation from the Division of Vocational Rehabilitation Services or other agencies providing transition services. The proposed amendment should specifically reference the Division of Developmental Disabilities (DDD) in the Department of Human Services, as this is the principle agency that serves people with multiple disabilities after graduation.
RESPONSE: Technical consultation is a specific service offered by the Division of Vocational Rehabilitation Services and was included in the rule to highlight this aspect of the agency's activities. However, as a result of comments received during the previous code revision, the Department is amending the rule to include any other agency that provides transition services. The Division of Developmental Disabilities is included in the consideration for technical consultation and no additional revision to the rule is needed.
[32 N.J.R. 2052(a), 2053 (June 5, 2000).]
The response appears to address current N.J.A.C. 6A:14-3.7(c)(9) and -3.7(d)(9), that now include "other agencies providing transition services." These amendments do not specifically mention the CBVI and DDD. However, the IDEA does not require specific reference to agencies serving the blind or severely developmentally disabled. The phrase "other agencies providing transition services" in these regulatory provisions is sufficiently broad to encompass the DDD and CBVI.
However, N.J.A.C. 6A:14-4.7(f)(1) fails to provide for placement of secondary-level students in programs approved by agencies other than only the DVRS. The failure to also broaden this regulation violates the policy of the IDEA and must be corrected by the promulgation and adoption of a new or revised regulation.

*625 IX. Procedural Rights Challenges

A. Rules Governing Discipline of Special Education Students

Appellants argue:
DOE'S REGULATIONS GOVERNING STUDENT DISCIPLINE VIOLATE IDEA AND ARE ARBITRARY AND CAPRICIOUS.
A. N.J.A.C. 6A:14-2.8(c) Fails to Satisfy DOE's Obligation to Adopt Rules Governing Special Education Discipline.
B. N.J.A.C. 6A:14-2.7(g), Relating to a Parent's Request for an Expedited Hearing in a Discipline Case, Violates the IDEA.
The Department's regulations concerning the discipline, suspension, or expulsion of special education students, provide:
(a) For disciplinary reasons, school officials may order the removal of a student with a disability from his or her current educational placement to an interim alternative educational setting, another setting, or a suspension for up to 10 consecutive or cumulative school days in a school year. Such suspensions are subject to the same district board of education procedures as nondisabled students. However, at the time of removal, the principal shall forward written notification and a description of the reasons for such action to the case manager.
1. The district board of education need not provide services during periods of removal to a student with a disability who has been removed from his or her current placement for 10 school days or less in that school year, if services are not provided to a student without disabilities who has been similarly removed.
(b) Removals of a student with a disability from the student's current educational placement for disciplinary reasons constitutes a change of placement if:
1. The removal is for more than 10 consecutive school days; or
2. The student is subjected to a series of short-term removals that constitute a pattern because they cumulate to more than 10 school days in a school year and because of factors such as the length of each removal, the total amount of time the student is removed and the proximity of the removals to one another.
i. School officials in consultation with the student's case manager shall determine whether a series of short-term removals constitutes a pattern that creates a change of placement.
(c) Disciplinary action initiated by a district board of education which involves removal to an interim alternative educational setting, suspension for more than 10 school days in a school year or expulsion of a student with a disability shall be in accordance with 20 U.S.C. § 1415(k), as amended and supplemented. (See chapter Appendixes A and D.)
(d) In the case of a student with a disability who has been removed from his or her current placement for more that 10 cumulative or consecutive school days in the school year, the district board of education shall provide services to the extent necessary to enable the student to progress appropriately in the general education curriculum and advance appropriately toward achieving the goals set out in the student's IEP.
1. When it is determined that a series of short-term removals is not a change of placement, school officials, in consultation with the student's special education teacher and case manager shall determine the extent to *626 which services are necessary to enable the student to progress appropriately in the general curriculum and advance appropriately toward achieving the goals set out in the student's IEP.
2. When a removal constitutes a change of placement, and it is determined that the behavior is not a manifestation of the student's disability, the student's IEP team shall determine the extent to which services are necessary to enable the student to progress appropriately in the general curriculum and advance appropriately toward achieving the goals set out in the student's IEP.
(e) In the case of a removal for drug or weapons offenses under 34 C.F.R. § 300.520(a)(2), or a removal by an administrative law judge for dangerousness consistent with 34 C.F.R. § 300.521, the district board of education shall provide services to the student with a disability consistent with 34 C.F.R. § 300.522 incorporated herein by reference.

[N.J.A.C. 6A:14-2.8 (emphasis added).]
The comprehensive provisions in the IDEA, 20 U.S.C.A. § 1415(k), and in the federal special education regulations, 34 C.F.R. §§ 300.519 to 300.529, governing the school discipline of children with disabilities are incorporated by the Department's special education regulations and included as appendices.
Appellants contend that appending the relevant provisions of the IDEA without adopting rules is insufficient because the procedures and substantive requirements are too complex for parents to understand without further explanation.
Although states are required to comply with the substantive and procedural requirements of the IDEA in order to receive federal funding, Beth V. v. Carroll, 87 F.3d 80, 82 (3d Cir.1996), there is no requirement that states must adopt regulations implementing all of the IDEA's provisions. Annexing relevant provisions of the IDEA or federal regulations is a sufficient method to achieve IDEA compliance. See Booker v. Everhart, 294 N.C. 146, 240 S.E.2d 360, 363 (1978) ("Incorporat[ion] of a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length[.]") Incorporating and appending the applicable IDEA provisions and federal regulations gives them the same status as the regulations promulgated by the Board. Moreover, our review of 20 U.S.C.A. § 1415(k), found in Appendix A to the Department's regulations, and the federal discipline regulations, 34 C.F.R. §§ 300.519 to 300.529, found in Appendix D, discloses that these provisions are accessible and understandable.
Appellants also argue that the Department's regulations are arbitrary, capricious, or unreasonable because they do not define certain terms that are used in 20 U.S.C.A. § 1415(k)"weapon," "functional behavioral assessment," "hearing officer," and "public agency." However, respondents are under no obligation to define terms used in the IDEA.
Appellants note that neither the annexed IDEA provisions, nor the Department's special education regulations, provide that if a "manifestation determination," made pursuant to 20 U.S.C.A. § 1415(k)(4), results in a determination that the student's behavior was the result of his or her disability, then the student may not be expelled or suspended from school. Notwithstanding the failure of the IDEA to address the situation where the "manifestation determination" results in a *627 conclusion that the behavior was caused by the disability, appellants contend the Department's regulations must do so. We disagree. In the absence of a federal standard or mandate by the IDEA, the Board's failure to adopt a regulation as proposed by appellants is neither arbitrary, capricious, nor unreasonable.
Appellants also contend the standard contained in N.J.A.C. 6A:14-2.8(d), applied to students with disabilities who are removed from their placement for ten or more days, violates the requirement in the IDEA that states must ensure that "[a] free appropriate public education is available to all children with disabilities... including children with disabilities who have been suspended or expelled from school." 20 U.S.C.A. § 1412(a).
In accordance with N.J.A.C. 6A:14-2.8(d), when a student with a disability is removed from placement "for more than 10 cumulative or consecutive school days in the school year," services must be provided "to the extent necessary to enable the student to progress appropriately in the general education curriculum and advance appropriately toward achieving the goals set out in the student's IEP." (Emphasis added).
Appellants argue that the terms "progress appropriately" and "advance appropriately" do not comply with the Third Circuit's interpretation of a FAPE as set forth in Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir.1999).
In Ridgewood, the court noted that the "IDEA leaves to the courts the task of interpreting [what is a] `free and appropriate public education.'" Ibid. The court ruled that the IDEA calls for more than a trivial educational benefit. Ibid. (citing Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182 (3d Cir.1988), cert. denied, 488 U.S. 1030, 109 S.Ct. 838, 102 L. Ed.2d 970 (1989)). The Ridgewood court stated that an IEP must provide "significant learning" and confer "meaningful benefit." Ibid.
We disagree with appellants' contention that the standards set forth in N.J.A.C. 6A:14-2.8(d) violate a child's right to a FAPE. When a child "progresses appropriately" in the educational curriculum and "advances appropriately" toward achieving the goals set forth in that child's IEP, this confers a "meaningful benefit" involving "significant learning," precisely the objective of a FAPE. Moreover, the language contained in N.J.A.C. 6A:14-2.8(d) mirrors the language contained in the federal special education regulations that "the public agency ... must ... [p]rovide services to the extent necessary to enable the child to appropriately progress in the general curriculum and appropriately advance toward achieving the goals set out in the child's IEP[.]" 34 C.F.R. § 300.121(d)(2)(i) (Emphasis added); see also 34 C.F.R. § 300.121(d)(3) ("School personnel, in consultation with the child's special education teacher, [must] determine the extent to which services are necessary to enable the child to appropriately progress in the general curriculum and appropriately advance toward achieving the goals set out in the child's IEP[.]" (Emphasis added)).
Appellants further contend that, despite the IDEA's mandate of parental involvement in all discipline determinations, the Department's regulations fail to involve parents in two critical areas. They first claim parents are excluded from participating in the determination of when a series of removals of fewer than ten days constitutes a change in placement, to which greater protections attach. N.J.A.C. 6A:14-2.8(b)(2)(i) requires school officials to consult "with the student's case manager" when determining "whether a series of short-term removals constitutes a *628 pattern that creates a change of placement."
However, we find nothing in the IDEA or its federal regulations stating which individuals should determine whether a series of short-term removals constitute a change in placement. Accordingly, that determination is implicitly left to the discretion and determination of the states. We conclude that making a decision as to whether a series of short-term removals constitutes a pattern creating a change of placement, without direct parental consultation, does not violate the IDEA, since this decision is fundamentally different from the procedures enumerated in the IDEA requiring parental input. While parental input is vital in the areas of evaluations, assessments, IEP development, and discipline, this determination is based on the educators' technical knowledge and expertise as to what constitutes a change in placement. Moreover, the child's special education teacher is in the unique position to evaluate the extent to which a series of short-term removals is disruptive to fulfilling the goals set forth in the child's IEP.
Appellants further assert that N.J.A.C. 6A:14-2.8(d)(1) improperly excludes parents from the determination of the level of educational services required to provide a FAPE for a student who has been suspended for more than ten days in a school year, where the removals do not constitute a change in placement. Under those circumstances, school officials must consult "with the student's special education teacher and case manager" in determining the extent to which services are needed "to enable the student to progress appropriately in the general curriculum and advance appropriately toward achieving the goals set out in the student's IEP." Ibid. This argument is without merit. The Department's regulation mirrors 34 C.F.R. § 300.121(d)(3)(i), which states that
"[s]chool personnel, in consultation with the child's special education teacher" shall determine the level of educational services required for the student to appropriately progress in the general curriculum and appropriately advance toward achieving the goals set forth in the child's IEP.
Additionally, appellants argue that while the Department recognizes the need to apply the IDEA's disciplinary provisions to the "potentially disabled," N.J.A.C. 6A:14-3.3(f) inappropriately narrows the group of "potentially disabled" students, as follows:
(f) When it is determined that an evaluation for eligibility for services under this chapter is warranted, the student shall be considered identified as potentially disabled. If the student is removed for disciplinary action, limitations on the amount of time the student is removed and the requirement to provide services shall be consistent with procedures in N.J.A.C. 6A:14-2.8.
Appellants allege it is improper to limit the application of discipline procedures required for disabled students to only those "potentially disabled" students for whom "it is determined that an evaluation for eligibility for services ... is warranted." Appellants cite to the following provision in the IDEA regarding protections for children not yet eligible for special education and related services:
(k) Placement in alternative educational setting
....
(8) Protections for children not yet eligible for special education and related services
(A) In general
A child who has not yet been determined to be eligible for special education and related services under this subchapter and who has engaged in *629 behavior that violated any rule or code of conduct of the local educational agency, including any behavior described in paragraph (1), may assert any of the protections provided for in this subchapter if the local educational agency had knowledge (as determined in accordance with this paragraph) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.
(B) Basis of knowledge
A local educational agency shall be deemed to have knowledge that a child is a child with a disability if
(i) the parent of the child has expressed concern in writing (unless the parent is illiterate or has a disability that prevents compliance with the requirements contained in this clause) to personnel of the appropriate educational agency that the child is in need of special education and related services;
(ii) the behavior or performance of the child demonstrates the need for such services;
(iii) the parent of the child has requested an evaluation of the child pursuant to section 1414 of this title; or
(iv) the teacher of the child, or other personnel of the local educational agency, has expressed concern about the behavior or performance of the child to the director of special education of such agency or to other personnel of the agency.
[20 U.S.C.A. § 1415(k)(8)(A) and (B).]
The federal special education regulations, 34 C.F.R. § 300.527(a)-(b), mirror the language of the IDEA.
Clearly, the Department's regulation is not as broad as the IDEA and its regulation. Since the Department's regulation limits the procedural safeguards to children where the school district has already determined that an evaluation for eligibility for services is warranted, numerous children are improperly excluded. Pursuant to the requirements contained in the IDEA, a parent simply has to request an evaluation, or a teacher of the child has to merely express a concern about the behavior or performance of a child to the director of special education or other school district personnel, and the procedural safeguards apply. Accordingly, we conclude N.J.A.C. 6A:14-3.3(f) violates the IDEA and must be amended or replaced with regulations that conform to these federal requirements.
Appellants also challenge the Department's special education regulation concerning a parent's request for an expedited hearing in disciplinary matters. N.J.A.C. 6A:14-2.7(g) provides:
(g) If the parent disagrees with the determination that the student's behavior was not a manifestation of the student's disability or with any decision regarding placement under 34 C.F.R. §§ 300.520 through 300.528, the parent may request an expedited hearing.
The procedure for expedited hearings is outlined in N.J.A.C. 6A:14-2.7(i). When an expedited hearing is requested in a disciplinary matter, mediation shall be offered and, if requested, be scheduled and completed prior to the expedited hearing, N.J.A.C. 6A:14-2.7(i)(2)(i) and (iii); the expedited hearing shall be conducted within ten calendar days of the request, N.J.A.C. 6A:14-2.7(i)(2)(ii);[2] the parties shall complete *630 the exchange of relevant records and materials at least two business days before the hearing, N.J.A.C. 6A:14-2.7(i)(3); and a written decision must be mailed to the parties within forty-five days of the request. N.J.A.C. 6A:14-2.7(i)(4).
Appellants contend the forty-five day standard contained in N.J.A.C. 6A:14-2.7(i)(4) is insufficient because it is identical to the deadline for non-expedited hearings. We disagree. The forty-five day deadline is not arbitrary, capricious, or unreasonable because it allows for no exceptions or extensions and provides the parent with a final decision within an accelerated time frame.
N.J.A.C. 6A:14-2.7(l) and (m) set forth a procedure for any party seeking emergency relief as part of a request for a due process hearing or an expedited hearing. N.J.A.C. 6A:14-2.7(m)(1)(i) through (iv) establish the criteria and standards to be applied by the administrative law judge when considering an application for emergent relief. Appellants assert that since, pursuant to 20 U.S.C.A. § 1415(k)(6)(A)(ii), the SEA or LEA must arrange for an expedited hearing in any disciplinary case when requested by a parent, any inquiries under the standards applicable to emergency relief, including a showing of irreparable harm, are inappropriate. They argue that the explicit expedited hearing requirement in the IDEA eliminates the need for meeting an emergency relief standard. We disagree.
Emergency relief is an entirely separate category from the expedited-hearing procedures contained in the regulations. Emergency relief may be requested by either party in addition to a request for an expedited hearing. Moreover, the emergent decision is a temporary decision until the matter is fully addressed at the expedited due process hearing. N.J.A.C. 6A:14-2.7(l). The emergency relief process is not redundant to the expedited hearing process, nor does it impermissibly slow the expedited hearing process.

B. State Complaint Procedures

Appellants argue:
BY FAILING TO ADOPT THE MINIMUM STATE COMPLAINT PROCEDURES GUARANTEED BY FEDERAL REGULATION, DOE'S REGULATIONS VIOLATE IDEA.
The Department's special education regulations pertaining to "complaint investigation" provide:
(a) The State Director of the Office of Special Education Programs or designee(s) shall be responsible for reviewing, investigating and taking action on any signed written complaint of substance regarding the provision of special education and related services covered under this chapter.
(b) An organization or individual may request a complaint investigation by submitting a written signed request to the State Director of the Office of Special Education Programs. The complaint shall include:
1. A statement that a public or private education agency has violated the requirements of State and/or Federal statute and/or regulation for the provision of special education and related services;
2. The facts on which the statement is based; and
3. The time period when the alleged violation occurred.
i. The complainant shall allege a violation that occurred not more than one year prior to the date that the complaint is received unless:
(1) A longer period is reasonable because the violation is continuing; or

*631 (2) The complainant is requesting compensatory services for a violation that occurred not more than three years prior to the date the complaint is received.
(c) The Office of Special Education Programs in conjunction with the county office of education shall complete an investigation within 60 calendar days after receipt of the written signed complaint.
1. The investigation may include, but not be limited to:
i. Review of policies and procedures;
ii. Review of student record(s);
iii. Observation of programs; and
iv. Interview(s).
2. The complainant shall be given the opportunity to provide additional information, either orally or in writing about the allegations in the complaint;
3. The State Director of the Office of Special Education Programs may extend the timeline for completion of the investigation only if exceptional circumstances exist with respect to a particular complaint.
(d) If a written complaint is also the subject of a due process hearing or contains multiple issues of which one or more are part of that hearing, the Office of Special Education Programs shall set aside any part of the complaint that is being addressed in the due process hearing until the conclusion of the hearing. Any issue in the complaint that is not part of the due process hearing shall be resolved according to (c) above.
1. If an issue is raised in a complaint that has been previously decided in a due process hearing involving the same parties, the hearing decision is binding and the Office of Special Education Programs shall inform the complainant to that effect.
(e) A report of findings, conclusions and, when warranted, the required corrective actions shall be sent to all parties.
(f) If the education agency is found to be in noncompliance, a corrective action plan shall be developed and submitted to the Department of Education through the county office of education.
(g) The corrective action plan shall include, but not be limited to:
1. Objectives and strategies for correcting each noncompliance item cited, including resources needed to obtain the objectives; and
2. The dates by which the noncompliance will be corrected.
(h) The county office of education shall review the corrective action plan and notify the State Director of the Office of Special Education Programs and the education agency if it is acceptable.
(i) The county office of education shall review the implementation of the corrective action and notify the State Director of the Office of Special Education programs when the implementation is completed.
(j) When a corrective action plan is not submitted, found unacceptable or implemented, the county office of education shall notify the agency of the actions the Department of Education intends to take.

[N.J.A.C. 6A:14-9.2.]
Appellants first contend that the Department's regulations do not ensure that the complaint procedures will be widely disseminated to parents and other interested individuals, such as parent training and information centers, protection and advocacy agencies, independent living centers, and other appropriate agencies, as required by the federal special education *632 regulations. 34 C.F.R. § 300.660(a)(2) provides:
(a) General. Each SEA shall adopt written procedures for
....
(2) Widely disseminating to parents and other interested individuals, including parent training and information centers, protection and advocacy agencies, independent living centers, and other entities, the States' procedures under §§ 300.660-300.662.
Respondents argue that N.J.A.C. 6A:14-2.3(e)(7) satisfies the requirement contained in 34 C.F.R. § 300.660(a)(2). We disagree. N.J.A.C. 6A:14-2.3(e)(7) provides:
(e) Written notice shall be in language understandable to the general public, and shall be provided in the native language of the parent, unless it is clearly not feasible to do so according to N.J.A.C. 6A:14-2.4. Written notice shall include:
....
7. In addition, a copy of the procedural safeguards statement published by the New Jersey Department of Education which contains a full explanation of the procedural safeguards available to parents shall be provided:
i. Upon referral for an initial evaluation;
ii. Upon each notification of an IEP meeting;
iii. Upon reevaluation; and
iv. When a request for a due process hearing is submitted to the Department of Education.
Although N.J.A.C. 6A:14-2.3(e)(7) mandates that a copy of the procedural safeguards statement, which includes the complaint procedures, must be provided to parents at the indicated stages, it fails to require dissemination of the statement at parent training and information centers, protection and advocacy centers, independent living centers, and other appropriate agencies. By failing to do so, many individuals who potentially have a disabled child may not be aware of these procedural safeguards.
Relying on 34 C.F.R. §§ 300.660, 300.662, the court in Upper Valley Ass'n for Handicapped Citizens v. Blue Mountain Union Sc. Dist. No. 21, 973 F.Supp. 429, 432 (D.Vt.1997), stated:
Implementing regulations of the IDEA require that states adopt written procedures for the receipt and resolution of complaints, from organizations or individuals, that a state or local educational agency has violated the IDEA or its regulations.
By failing to require dissemination of the procedural safeguards statement to agencies and centers, the Department's regulations violate federal policy. We conclude N.J.A.C. 6A:14-2.3(e)(7) is not broad enough to include the proper dissemination under the federal standard. Accordingly, the Board shall promulgate and adopt a regulation that complies with this federal mandate.
Appellants also argue that although the Department's regulations require "a report of findings [and] conclusions[,]" N.J.A.C. 6A:14-9.2(e), they do not require a determination as to whether the public agency is violating a requirement of the IDEA, as required in the following federal special education regulations:
Minimum State complaint procedures.
(a) Time limit; minimum procedures. Each SEA shall include in its complaint procedures a time limit of 60 days after a complaint is filed under § 300.660(a) to
....

*633 (3) Review all relevant information and make an independent determination as to whether the public agency is violating a requirement of Part B of the Act or of this part[.]

[34 C.F.R. § 300.661(a)(3).]
After carefully reviewing N.J.A.C. 6A:14-9.2, we conclude this regulation does not violate 34 C.F.R. § 300.661(a)(3). Pursuant to N.J.A.C. 6A:14-9.2(a), complaints address "the provision of special education and related services covered under this chapter," and a report of findings, conclusions and corrective actions, when warranted, concerning the complaint is issued pursuant to N.J.A.C. 6A:14-9.2(e). The Department's regulation lists activities, such as reviews of records and policies, and interviews of persons, that the Department may engage in when investigating a complaint, N.J.A.C. 6A:14-9.2(c)(1)(i)(iv), which list is not exclusive. Obviously, the very focus of the complaint procedure is an inquiry into whether the special education and related services requirements applicable to children with disabilities and their parents, contained in the IDEA and federal and state special education regulations, are being complied with. The procedures set forth in N.J.A.C. 6A:14-9.2 clearly require a determination as to whether the public agency is violating a requirement of the IDEA.
Appellants further assert the Department's special education regulations fail to include "procedures for the effective implementation of the SEA's final decision" in accordance with 34 C.F.R. § 300.661(b)(2). That federal regulation, establishing minimum state complaint procedures, provides:
(b) Time extension; final decision; implementation. The SEA's procedures described in paragraph (a) of this section also must
....
(2) Include procedures for effective implementation of the SEA's final decision, if needed, including
(i) Technical assistance activities;
(ii) Negotiations; and
(iii) Corrective actions to achieve compliance.

[34 C.F.R. § 300.661(b)(2).]
Appellants contend that although the Department's regulations call for development of a corrective action plan by the non-compliant agency, they do not specify the use of "technical assistance activities" and "negotiations" as implementation procedures. We conclude that the Department's regulations sufficiently comply with the federal requirement that a corrective action plan be developed and that all aspects of the final decision with regard to a complaint investigation be implemented, N.J.A.C. 6A:14-9.2(e)(g), and are broad enough to encompass all needed implementation tools.
Appellants further argue that the Department's regulations fail to require that a copy of the district's corrective action plan be sent to the original complainant for review and comment, which they contend is essential for effective implementation. Our review of the IDEA and its regulations reveals no federal requirement that the complainant be given an opportunity to review and comment on the corrective action plan.
Appellants also note that the Department's regulations only require the county office of education to notify the noncompliant educational agency "of the actions the Department of Education intends to take[,]" and do not require notice to the complainant. N.J.A.C. 6A:14-9.2(j). Accordingly, appellants maintain these regulations do not set forth any procedure for effective implementation "[w]hen a corrective *634 action plan is not submitted, found unacceptable or implemented[.]" Ibid. However, N.J.A.C. 6A:14-9.2(f) requires the development of a corrective action plan, and N.J.A.C. 6A:14-9.2(g), specifies its contents. We construe N.J.A.C. 6A:14-9.2(j) as placing that burden on the county office of education should the LEA fail to do so.
Appellants also contend that the Department's regulations fail to incorporate the available remedies for the denial of appropriate services to a child as specified in the following federal special education regulation:
Adoption of State complaint procedures.
....
(b) Remedies for denial of appropriate services. In resolving a complaint in which it has found a failure to provide appropriate services, an SEA, pursuant to its general supervisory authority under Part B of the Act, must address:
(1) How to remediate the denial of those services, including, as appropriate, the awarding of monetary reimbursement or other corrective action appropriate to the needs of the child; and
(2) Appropriate future provision of services for all children with disabilities.

[34 C.F.R. § 300.660(b).]
We conclude that N.J.A.C. 6A:14-9.2(f), requiring development of a corrective action plan, N.J.A.C. 6A:14-9.2(g), requiring that objectives and strategies for correcting each non-compliance item shall be set forth in the plan, and N.J.A.C. 6A:14-9.2(j), permitting the Department to take any action it deems necessary when a corrective action plan is inadequate, are sufficient to conform to the requirements contained in 34 C.F.R. § 300.660(b) that the deficiencies be remediated and appropriate services provided to students with disabilities.
Although appellants also claim in their briefs that the Department's regulations fail to address the mandatory federal procedures applicable when a complaint and due process hearing request are filed concerning the same issue, 34 C.F.R. § 300.661(c)(1), and fail to address the complaint time limitations established by 34 C.F.R. § 300.662(c), we note that N.J.A.C. 6A:14-9.2(d) mirrors the language contained in 34 C.F.R. § 300.661(c)(1), and N.J.A.C. 6A:14-9.2(b)3 adopts the same complaint limitation provisions contained in 34 C.F.R. § 300.662(c).
C. Methods for Selecting and Training Surrogate Parents
Appellants argue:
1. BY FAILING TO MANDATE UNIFORM STATE WIDE METHODS FOR SELECTING AND TRAINING SURROGATE PARENTS, DOE'S REGULATIONS VIOLATE IDEA AND ARE ARBITRARY AND CAPRICIOUS.
2. BY FAILING TO PROHIBIT THE APPOINTMENT OF NONPUBLIC AGENCY EMPLOYEES INVOLVED IN THE EDUCATION OR CARE OF A CHILD, DOE'S REGULATIONS VIOLATE IDEA.
The Department's regulations require the provision of an individual to act as surrogate for the parent of a student with a disability, to "ensure that the rights of a student are protected," when either the parent cannot be identified or located, or a State agency has guardianship of the child. N.J.A.C. 6A:14-2.2(a). N.J.A.C. 6A:14-2.2(b) provides that "[e]ach district board of education or responsible State agency shall establish a method for selecting and training surrogate parents." Appellants contend this regulation fails to *635 ensure uniformity or provide guidance to local school districts in selecting and training surrogate parents.
However, our review of the IDEA and federal special education regulations discloses no requirement or standard that addresses how a school district selects and trains surrogate parents. The provisions of the IDEA cited to by appellants only establish the requirement for appointment of the surrogate parent, 20 U.S.C.A. § 1415(b)(2); the general requirement that procedures be established and maintained "to ensure that children with disabilities and their parents are guaranteed procedural safeguards[,]" 20 U.S.C.A. § 1415(a); the mandate that LEAs have "in effect policies, procedures, and programs that are consistent with the State policies and procedures established" under the IDEA, 20 U.S.C.A. § 1413(a)(1); and the requirement that children with disabilities and their parents be afforded the IDEA's procedural safeguards, 20 U.S.C.A. § 1412(a)(6). None of the cited sections impose standards for the methods of selecting and training surrogate parents.
In response to a comment to the proposed amendments to the special education regulations relating to this issue, the Department stated:
32. COMMENT: The current N.J.A.C. 6A:14-2.2(b) requires each district or responsible State agency to establish methods for selecting and training surrogate parents. The commenters believe the State should establish the methods for selecting and training surrogates to provide necessary guidance to districts and ensure uniformity.
RESPONSE: The Department intends to provide guidance to districts on these issues by developing technical assistance materials for use by districts. Therefore, no additional rules are necessary.
[32 N.J.R. 2052(a), 2055 (June 5, 2000).]
We are in substantial agreement with the Department's conclusion that no additional rules are necessary. Appellants have not demonstrated that the IDEA mandates uniform statewide methods for selecting and training surrogate parents, or that the current regulation is arbitrary, capricious, or unreasonable, since the Department has expressed an intent to provide technical assistance materials to local school districts without mandating specific criteria for selection and training.
Appellants also argue that the Department's regulations are contrary to the IDEA in that they do not prohibit the appointment of an employee of a nonpublic agency involved in the education or care of the child as that child's surrogate parent.
N.J.A.C. 6A:14-2.2(d) mandates that "[t]he person(s) serving as a surrogate parent may not be an employee of the Department of Education, the district board of education or public agency providing services to the student." Appellants contend this prohibition should be extended to nonpublic agency employees when their agency is involved in the education or care of a child. We agree.
The IDEA provides that the local educational agency must have
procedures to protect the rights of the child whenever the parents of the child are not known, the agency cannot, after reasonable efforts, locate the parents, or the child is a ward of the State, including the assignment of an individual (who shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child) to act as a surrogate for the parents[.]

*636 [20 U.S.C.A. § 1415(b)(2) (Emphasis added).]
This provision clearly excludes all employees of any agency, public or nonpublic, that is involved in the education or care of the child. The federal special education regulations also contain this prohibition. See 34 C.F.R. § 300.515(c)(2)(i). The failure of N.J.A.C. 6A:14-2.2(d) to include employees of any "nonpublic" agency involved in the education or care of the child frustrates the federal conflict-of-interest policy. Accordingly, the Board shall promulgate and adopt a regulation, amending or replacing N.J.A.C. 6A:14-2.2(d), fully encompassing the federal conflict-of-interest standard for the appointment of surrogate parents.

X. Child Find Procedures

Appellants argue:
BY FAILING TO ADOPT CRITICAL PROVISIONS OF IDEA'S "CHILD FIND" MANDATE, DOE'S REGULATIONS VIOLATE IDEA.
Appellants first contend the Department's "child find" regulations fail to address the IDEA's requirement that a practical method be developed and implemented to determine which children are currently receiving special education and related services. The federal special education regulations provide, in relevant part:
Child find.
(a) General requirement.
(1) The State must have in effect policies and procedures to ensure that
...
(ii) A practical method is developed and implemented to determine which children are currently receiving needed special education and related services.

[34 C.F.R. § 300.125(a)(1)(ii).]
That regulation effectuates the IDEA requirement that:
All children with disabilities residing in the State, including children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.
[20 U.S.C.A. § 1412(a)(3)(A) (Emphasis added).]
The Department's child find special education regulation provides, in pertinent part:
(a) Each district board of education shall develop written procedures for students age three through 21, including students attending nonpublic schools, who reside within the local school district with respect to the location and referral of students who may be disabled due to physical, sensory, emotional, communication, cognitive or social difficulties.
1. The requirements of this section apply to highly mobile students with disabilities, such as migrant and homeless students, and to students who may be disabled even though they are advancing from grade to grade.
2. The activities undertaken to locate nonpublic school students with disabilities shall be comparable to activities undertaken to locate public school students with disabilities. In addition, each district board of education shall consult with appropriate representatives of nonpublic school students on how to carry out these activities.

*637 3. The referral procedures shall provide for:
i. Interventions in the general education program according to N.J.A.C. 6:26;
ii. Evaluation to determine eligibility for special education and related services; and/or
iii. Other educational action, as appropriate.

[N.J.A.C. 6A:14-3.3(a).]
Additionally, N.J.A.C. 6A:14-1.2(e)(1) requires each district board of education to submit an annual report detailing "the numbers of students with disabilities according to their Federal disability category, age, racial-ethnic background, and placement[.]"
Appellants argue that without a practical method to determine who is in fact receiving special education and related services, school districts cannot be held accountable for their attempts to locate, refer, and evaluate children with disabilities, and ultimately ensure that such children receive special education and related services.
In response to a comment during the promulgation and consideration of the proposed regulations, the Department stated:
51. COMMENT: The "child find" rule at N.J.A.C. 6A:14-3.3 does not incorporate the Federal regulatory requirements at 34 C.F.R. § 300.125(a)(1)(ii), that a practical method be developed and implemented to determine which children are currently receiving needed special education and related services. Furthermore, under New Jersey administrative law, all policies and procedures of general applicability must be promulgated as regulations.
RESPONSE: The applicable child find rule that meets the Federal requirements at 34 C.F.R. § 300.125(a)(1)(ii) can be found at N.J.A.C. 6A:14-1.2, Eligibility for assistance under IDEA Part B. According to N.J.A.C. 6A:14-1.2[ (e) ], each district board of education must submit an annual data report of the numbers of students with disabilities according to disability category, age, racial-ethnic background and placement. This report is used to determine which children are currently receiving needed special education and related services.
[32 N.J.R. 2052(a), 2056 (June 5, 2000).]
The IDEA and federal special education regulations do not provide any further explanation of this "practical method" requirement, and do not require states to establish the method to determine which children are currently receiving special education and related services. Instead, the IDEA and its regulations require that each state have policies and procedures to ensure that a practical method is developed. Since the Department's regulations require each district board of education to develop written procedures for locating students who may be disabled, we conclude those regulations satisfy the IDEA requirements.
Second, appellants assert the Department's regulations fail to set forth several of the requirements listed in 34 C.F.R. § 300.125(b) and (c). Those child find federal regulations provide:
(b) Documents relating to child find. The State must have on file with the Secretary the policies and procedures described in paragraph (a) of this section, including
(1) The name of the State agency (if other than the SEA) responsible for coordinating the planning and implementation of the policies and procedures under paragraph (a) of this section;

*638 (2) The name of each agency that participates in the planning and implementation of the child find activities and a description of the nature and extent of its participation;
(3) A description of how the policies and procedures under paragraph (a) of this section will be monitored to ensure that the SEA obtains
(i) The number of children with disabilities within each disability category that have been identified, located, and evaluated; and
(ii) Information adequate to evaluate the effectiveness of those policies and procedures; and
(4) A description of the method the State uses to determine which children are currently receiving special education and related services.
(c) Child find for children from birth through age 2 when the SEA and lead agency for the Part C program are different.
(1) In States where the SEA and the State's lead agency for the Part C program are different and the Part C lead agency will be participating in the child find activities described in paragraph (a) of this section, a description of the nature and extent of the Part C lead agency's participation must be included under paragraph (b)(2) of this section.
(2) With the SEA's agreement, the Part C lead agency's participation may include the actual implementation of child find activities for infants and toddlers with disabilities.
(3) The use of an interagency agreement or other mechanism for providing for the Part C lead agency's participation does not alter or diminish the responsibility of the SEA to ensure compliance with the requirements of this section.

[34 C.F.R. § 300.125(b), (c).]
The Department answered a comment related to this issue during the promulgation phase of its regulations, as follows:
64. COMMENT: The proposed amendments at N.J.A.C. 6A:14-6.1(d) do not incorporate the Federal requirements for child find for private school children with disabilities, 34 C.F.R. § 300.451, and for child count, 34 C.F.R. § 300.453(b). Neither do they require the State to ensure that the districts develop and implement an appropriate service plan for each child, 34 C.F.R. § 300.452.
RESPONSE: The Department disagrees with the comment. The requirements for child find are found at N.J.A.C. 6A:14-3.3(a). The requirement to report students with disabilities attending nonpublic schools is located at N.J.A.C. 6A:14-6,4(b). The requirement to develop, review and revise a service plan is found at N.J.A.C. 6A:14-6.1(d)1.
[32 N.J.R. 2052(a), 2057 (June 5, 2000).]
We disagree with the Department's response. The federal special regulations require, in 34 C.F.R. § 300.125(b)(3) and (4), that each state have on file with the Secretary of Education a description of how the policies and procedures pursuant to 34 C.F.R. § 300.125(a) will be monitored to ensure that the state educational agency obtains information on the number of children identified within each category of disability, information adequate to evaluate the effectiveness of those policies and procedures, and a description of the method the state uses to determine which children are currently receiving special education and related services. These federal requirements have not been met by merely mandating *639 that each school district develop written procedures.
We conclude that N.J.A.C. 6A:14-3.3 fails to incorporate all the federal requirements of child find as set forth in 34 C.F.R. § 300.125. By failing to do so, the Department's regulation is inconsistent with the federal mandate in 20 U.S.C.A. § 1412(a)(3)(A) and 34 C.F.R. § 300.125(a)(1)(ii).
Although not raised, we have considered, and rejected, the proposition that since New Jersey must comply with the provisions of the IDEA and its implementing federal regulations to be able to receive federal monies for educating children with disabilities, the failure to include every aspect of the federal provisions in the Department's regulations would not make those regulations invalid.
This position is similar to respondents' position on other issuesthe regulations need not contain provisions mandating compliance by local school districts because the federal regulations address policies and procedures requiring that only states, not school districts, must file with the Secretary of the USDOE.
However, the Department's "regulations are written to be read and followed by non-lawyers in hundreds of school districts across the state[,]" In re N.J.A.C. 6:28-2.10, 305 N.J.Super. 389, 403, 702 A.2d 838 (1997) (quoting In re Repeal of N.J.A.C. 6:28, 204 N.J.Super. 158, 163-64, 497 A.2d 1272 (App.Div.1985)), as well as parents of disabled children, so they should be comprehensive and include all requirements set forth in the federal standard. While these requirements are for states and not local school districts, the public should still be aware of what must be filed with the federal government, such as the standards for child find and the number of children within each disability category. Otherwise, parents and other concerned individuals will not have a clear understanding of all the standards that are applicable, and how those standards are applied in New Jersey.
With other portions of the IDEA, where a federal standard is not entirely clear in the Department's regulations, the Board has incorporated parts of the IDEA and its federal special education regulations by attaching them as appendices to its regulations. Here, the failure to incorporate the applicable portions of the IDEA or its regulations constitutes the adoption of a regulation inconsistent with the federal standard. Accordingly, N.J.A.C. 6A:14-3.3 must be amended, or a new regulation adopted, to make the Department's regulations consistent with federal law.
XI. Written Reports for Specific Learning Disability Evaluations
Appellants argue:
BY FAILING TO REQUIRE FULL WRITTEN REPORTS FOR SLD EVALUATIONS, DOE'S REGULATIONS VIOLATE IDEA.
The Department's regulation concerning reports of assessment of a child suspected of having a SLD state:
(f) A written report of the results of each assessment shall be prepared. At the discretion of the district, the written report may be prepared collaboratively by the evaluators or each evaluator may prepare an individually written report of the results of his or her assessments. Each written report shall be dated and signed by the individual(s) who conducted the assessment and shall include:
....
4. When the student is suspected of having a specific learning disability, the documentation of the determination of eligibility shall include a statement of:

*640 i. Whether the student has a specific learning disability;
ii. The basis for making the determination;
iii. The relevant behavior noted during the observation;
iv. The relationship of that behavior to the student's academic performance;
v. Educationally relevant medical findings, if any;
vi. Whether there is a severe discrepancy between achievement and ability that is not correctable without special education and related services; and
vii. The determination concerning the effects of environmental, cultural or economic disadvantage.

[N.J.A.C. 6A:14-3.4(f)(4).]
Appellants correctly note that although N.J.A.C. 6A:14-3.4(f)(4) sets forth part of the federal requirement for documentation by the IEP team of SLD evaluations, it omits the federal requirement contained in 34 C.F.R. § 300.543(b) that,
[e]ach team member shall certify in writing whether the report reflects his or her conclusion. If it does not reflect his or her conclusion, the team member must submit a separate statement presenting his or her conclusions.
We view the federal requirementthat IEP team members who disagree with the evaluation or team's conclusion write separately stating their viewsas particularly important to the parents of disabled children who may disagree with conclusions of an IEP team. By requiring dissenting members of a team to write separate statements, or certify whether the joint report reflects his or her conclusions, parents who also disagree would become aware of the dissent. Without that requirement, the views of a dissenting team member may remain unknown, and the IEP report reduced to a majority decision. Such a result runs contrary to the purposes of the IDEA to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique need[,]" 20 U.S.C.A. § 1400(d)(1)(A), and "to ensure that the rights of children with disabilities and parents of such children are protected[,]" 20 U.S.C.A. § 1400(d)(1)(B). Since the absence of this requirement frustrates the federal policy, the Department's regulations must be amended to encompass the noted provisions contained in 34 C.F.R. § 300.543(b). The amendment incorporating the federal requirement shall have general application to all evaluations delineated in N.J.A.C. 6A:14-3.4(f), not only those pertaining to an evaluation of the existence of a SLD.
Respondents' contention that appellants' challenges of this regulation is untimely, because N.J.A.C. 6A:14-3.4(f) was part of the Department's regulations in effect as of the filing of the first notice of appeal in A-7451-97T1, yet was not originally challenged, is without merit and does not warrant discussion in this opinion. R. 2:11-3(e)(1)(E). See also Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 471 n. 10, 476 A.2d 784 (1984) (noting that generally the 45 day limit on appeals from final decisions of state agencies imposed by R. 2:4-1(b) does not apply to challenges to the validity of regulations); In re Petition for Substantive certification filed by Township of Warren, 247 N.J.Super. 146, 158, 588 A.2d 1227 (App.Div.1991) (stating courts are reluctant to dismiss as untimely appeals that raise important public questions of general applicability), rev'd on other grounds, 132 N.J. 1, 622 A.2d 1257 (1993).

*641 XII. Summary of Rulings

Our careful review of the record in the light of the oral and written arguments by the parties discloses that in the majority of the numerous challenges posed to the New Jersey special education regulations, appellants have failed to sustain their burden of demonstrating that the regulations violate the IDEA, the federal special education regulations, the New Jersey special education laws, or that they are arbitrary, capricious or unreasonable.
However, we have concluded that appellants have sustained that burden in the following eight areas that will require the promulgation and adoption of new or amended regulations that comply with the federal mandates contained in the IDEA and its regulations:
1. N.J.A.C. 6A:14-3.5(a) must be amended or replaced to ensure that copies of evaluation reports, tests, materials, and other documentation of the eligibility are provided to parents within a reasonable time prior to the eligibility conference to facilitate the meaningful participation of parents and others they consult in the determination of eligibility;
2. N.J.A.C. 6A:14-3.7(d)(8) must be amended, or a regulation added, that will include a transition-services provision, as contained in the Department's prior regulation, N.J.A.C. 6:28-4.7(b)(2), requiring assessments to determine appropriate post-secondary outcomes;
3. N.J.A.C. 6A:14-4.7(f) must be amended or replaced with a regulation that broadens the potential pool of community rehabilitation programs for secondary-level students to include those approved by agencies, in addition to the DVRS, similar to the provision contained in N.J.A.C. 6A:14-3.7(d)(9);
4. N.J.A.C. 6A:14-3.3(f) improperly limits the application of disciplinary procedural safeguards to only those potentially disabled students for whom it is determined that an evaluation for eligibility services is warranted. This regulation must be amended or replaced with a regulation that conforms to the broader protections afforded by 20 U.S.C.A. § 1415(k)(8)(A) and (B);
5. N.J.A.C. 6A:14-2.3(e)(7) must be amended or replaced by a regulation mandating that a copy of the procedural safeguards statement be disseminated at parent training and information centers, protection and advocacy centers, independent living centers, and other appropriate agencies;
6. N.J.A.C. 6A:14-2.2(d) must be amended or replaced with a regulation conforming with the requirements contained in 20 U.S.C.A. § 1415(b)(2) that excludes from consideration as a surrogate parent for a child with a disability, any employee of any public or nonpublic agency that is involved in the education or care of the child;
7. N.J.A.C. 6A:14-3.3 must be amended or replaced by a regulation that incorporates all of the "child find" provisions contained in 34 C.F.R. § 300.125;
8. N.J.A.C. 6A:14-3.4(f) must be amended, or a separate regulation promulgated and adopted, requiring that each IEP team member certify in writing whether their report reflects his or her conclusion and, if it does not, the dissenting IEP team member shall submit a separate statement presenting his or her conclusions.
Appellants have requested that we order the respondents to conduct emergency rule-making so that new regulations can be promptly promulgated. We reject that request. An agency may adopt emergency regulations without strict notice and comment procedures if it "finds that an imminent peril to the public health, safety, *642 or welfare requires adoption of a rule[.]" N.J.S.A. 52:14B-4(c); N.J.A.C. 1:30-4.5. Since these provisions contemplate findings of "imminent peril to the public health, safety, or welfare" by the agency to support invocation of the emergency procedures, the appropriate procedure is for appellants, if they desire, to apply directly to the Department where they can assert that the new rules should be promulgated on an emergency basis. The record before us does not support "imminent peril" as that concept is discussed in County of Hudson v. Dep't of Law & Pub. Safety, 328 N.J.Super. 308, 311, 316, 746 A.2d 5 (App. Div.), certif. denied, 164 N.J. 190, 752 A.2d 1292 (2000) (juvenile detention center overcrowding creating operational instability, justifying adoption of emergency regulation) and Delaware Bay Waterman's Ass'n of N.J. v. New Jersey Dep't of Envtl. Prot., 304 N.J.Super. 20, 22, 697 A.2d 957 (1997), appeal dismissed as moot, 153 N.J. 345, 709 A.2d 192 (1998) (immediate threat to species of shorebirds justifying adoption of emergency regulation).
The conformance of the Department's regulations with the federal requirements contained in the IDEA and its federal regulations is a matter of significant public importance. Appellants have only sought prospective relief. In that context, we trust the Commissioner and the Board will act as soon as prudently possible to promulgate and adopt amendments to the Department's regulations that conform to this opinion.
We affirm in part, and remand in part for the promulgation and adoption of new special education regulations, consistent with this opinion, to replace those regulations we have determined to be invalid. We do not retain jurisdiction.
NOTES
[1] The Commissioner of the Department of Education at the time of argument was David C. Hespe.
[2] The expedited hearing is conducted before an administrative law judge. N.J.A.C. 6A:14-2.7(i)(2).